## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Apr 02 2015, 8:31 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Donald R. Shuler
Barkes, Kolbus, Rife & Shuler, LLP
Goshen, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

Nicholas A. Rushlow,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 2, 2015

Court of Appeals Case No.
20A03-1408-CR-310

Appeal from the Elkhart Circuit Court.
The Honorable Terry C. Shewmaker, Judge.
Cause No. 20C01-1306-FA-28

**Barteau, Senior Judge**

## Statement of the Case

[1] The State accused Nicholas A. Rushlow of going to a house in the middle of the night and shooting at its occupants. Rushlow appeals his convictions and

aggregate sentence for attempted murder, a Class A felony,[1] and criminal

recklessness, a Class C felony.[2] We affirm.

## Issues

Rushlow raises three issues, which we restate as:

> I. Whether the trial court abused its discretion in denying Rushlow's motion to hire an expert witness.
>
> II. Whether the evidence is sufficient to sustain Rushlow's convictions.
>
> III. Whether Rushlow's sentence is inappropriate in light of the nature of the offense and the character of the offender.

## Facts and Procedural History

In June 2010, James Curtis complained to the police that Rushlow had physically attacked him. The State filed criminal charges against Rushlow, and James testified against him. Later, during the first week of October 2010, James' wife, Ashley Curtis, was walking in her neighborhood when she saw Rushlow sitting on the steps of a house. Rushlow told her, "It's not over with." Tr. p. 338.

In the very early morning hours of October 11, 2010, James and Ashley were asleep in their house in Elkhart. The house had an enclosed front porch with a

[1] Ind. Code §§ 35-42-1-1 (2007), 35-41-5-1 (1977).

[2] Ind. Code § 35-42-2-2 (2006).

door, and inside the porch one could enter the house through a glass front door with an attached storm door. Ashley's nine-year-old son, James' cousin Johnny, Johnny's girlfriend Tina, Tina's son, and James' mother were also in the house. James' mother slept on the ground floor of the house on a couch not far from the front door.

[5] James and Ashley were awakened by someone pounding on their front door. Ashley came downstairs with one of her dogs. As she came down the steps, she heard a person on the porch yell, "Elkhart City Police, open up. We have [a] warrant for Jimmy." *Id.* at 348. Ashley loudly said, "Give me a moment," because she needed to take her dog back upstairs. *Id.* at 349.

[6] At that point, James turned on the lights for the stairway and the front room and began walking down the stairs. He heard a person on the porch claiming to be the police and claiming to have a warrant for his arrest.

[7] Ashley started back up the stairs. As she did so, she turned around to order her dog, who was at the front door, to follow her. She looked out the front door and saw Rushlow. James, who was still on the stairs, also saw Rushlow, carrying a handgun. James saw Rushlow point the gun at him, heard a shot, and felt the bullet hit his head.

[8] Next, James pushed Ashley onto the stairs and shielded her body with his. Ashley heard five gunshots. James urged her to go upstairs. She did so and called 911 after checking on her son. The 911 operator asked Ashley who shot her, and she identified Rushlow.

[9] Meanwhile, James and Ashley's neighbor, Laura Smith, heard the gunshots, followed by the sound of "shoes pounding the pavement," as if a person was running very quickly. *Id.* at 421. Another neighbor, Charles Landis, was awakened by the gunshots. He looked out a window and saw a person running away from where Landis believed the shots had been fired. The person was wearing a dark-colored hooded sweatshirt.

[10] Police were dispatched to James and Ashley's house. Sergeant Nathan Lanzen[3] arrived at 1:37 a.m. He saw that the porch door's latch was broken. Inside the porch, he saw that the top half of the front door's glass had been shattered.

[11] Sergeant Lanzen spoke with James and Ashley. James had a "graze wound" on top of his head. *Id.* at 301. Sergeant Lanzen also saw five bullet holes in a wall along the stairwell. James told Sergeant Lanzen that Rushlow was the shooter. Sergeant Lanzen notified other officers, who found Rushlow at home.

[12] Later on October 11, Smith took her dog for a walk, going in the same direction as the running noises she had heard during the night. After walking for a few blocks, she saw a row of bushes. Someone had discarded a black hooded sweatshirt and a black glove under a bush. Next, she looked under a different bush and found a handgun. Smith called the police. Officer Chris Bella arrived

---

[3] Sergeant Lanzen was a patrolman at the time of the incident and was promoted prior to the trial. We refer to him as Sergeant.

and collected the items. The police found another, matching black glove in the same area the next day.

[13]     After collecting the items that Smith had pointed out, Officer Bella went to James and Ashley's house to look for spent bullets. James tore open the stairway wall where the bullets had struck, and Officer Bella found several bullet fragments.

[14]     The State tested the handgun, a .38 special, in comparison with the bullet fragments. The State determined, and Rushlow stipulated at trial, that one of the bullet fragments that was found in the wall of James and Ashley's house could have been fired from the .38 special. The other fragments were "unsuitable for microscopic examination." *Id.* at 492.

[15]     The State collected a DNA sample from Rushlow and compared it to DNA found on the sweatshirt. The sweatshirt had DNA from three different persons, two females and one male. Rushlow's DNA sample matched the male contributor "to a degree of scientific certainty." *Id.* at 575. In addition, one of the unknown females was genetically related to Rushlow and the other unknown female. During this time period, Rushlow lived with his girlfriend, and they had a young daughter together. Finally, testing revealed that Rushlow could not be ruled out as a contributor to a mixture of DNA found on one of the gloves.

[16]     On June 6, 2013, the State charged Rushlow with attempted murder as to James and criminal recklessness as to Ashley. Rushlow was indigent, but his

family hired an attorney to represent him. On May 30, 2014, almost a year after the State filed the charges, and almost a month before trial, Rushlow filed a motion to allocate public funds for him to hire a DNA expert. After a hearing, the trial court denied Rushlow's motion.

[17] The case was tried to a jury. During trial, Rushlow objected to the admission of any and all DNA evidence, noting that the court had denied his request to hire a DNA expert using public funds. The court reaffirmed its decision to deny Rushlow's request for funds to hire an expert and overruled Rushlow's objection. Later during the trial, Rushlow conceded that the hooded sweatshirt belonged to him.

[18] The jury determined that Rushlow was guilty as charged. The court sentenced Rushlow to the maximum aggregate sentence of fifty-eight years, to be served consecutively to his sentence in a federal case that preceded the current charges. This appeal followed.

# Discussion and Decision

## I. Appointment of Expert Witness

[19] Rushlow claims the trial court erred by denying his request to hire a DNA expert at public expense because it unduly hampered his defense, and the subsequent admission of the DNA evidence at trial violated his right to due process of law. Decisions about expert services for indigent defendants are committed to the trial court's sound discretion, and such decisions are not overturned absent an abuse of that discretion. *Jackson v. State*, 758 N.E.2d 1030,

1034 (Ind. Ct. App. 2001). A defendant who requests funds for an expert witness has the burden of demonstrating the need for that expert. *Tidwell v. State*, 644 N.E.2d 557, 560 (Ind. 1994). The decision must be made on a case-by-case basis. *Id.*

[20] The central inquiries for a trial court in deciding whether to allocate expert witness funds to a defendant are whether the expert witness's services are necessary to assure an adequate defense, and whether the defendant specifies precisely how he or she would benefit from the requested expert services. *Scott v. State*, 593 N.E.2d 198, 200 (Ind. 1992). The following considerations, among others, are relevant to those inquiries: (1) whether the expert's services bear on an issue which is generally regarded to be within the common experience of the average person, or on an issue for which expert opinion would be necessary; (2) whether the requested services could be performed by counsel; (3) whether it is improbable that the proposed expert could demonstrate that which the defendant desires; (4) whether the purpose of the expert appears to be exploratory only; (5) whether the expert services will go toward answering a substantial question or simply an ancillary one; (6) the seriousness of the charge(s) at issue and the severity of the possible penalty; (7) the complexity of the case; (8) the proposed cost of the expert services; (8) the timeliness of the defendant's request; (9) whether the defendant is making the request in good faith; (10) whether the expert's testimony would be admissible at trial; and (11) whether the evidence for which the expert's services are requested is cumulative of other evidence. *Id.* at 200-01.

[21]     Rushlow argues that the trial court erred because the topic for which he requested expert assistance, DNA testing, is beyond the common experience of the average person and cannot be performed by counsel. He notes that he was facing serious charges and potentially severe penalties. Finally, he asserts that he explained to the trial court that he needed an expert witness to determine whether the State's expert's testing was performed accurately and without bias.

[22]     Rushlow's points are counterbalanced, and outweighed, by the following factors. The State filed charges against Rushlow in June 2013, but Rushlow did not file his motion for public funds to hire an expert witness until June 2014, a year later. The trial court deemed his motion untimely, as it was filed only a month before the scheduled trial date. Rushlow did not identify a proposed expert witness or provide any estimate of how much the expert's services would cost. Further, Rushlow's purpose appears to have been merely exploratory, because he failed to specify any precise benefit to be gained by hiring his own expert. Finally, the DNA evidence—which was intended to connect Rushlow to the hooded sweatshirt and a glove, and thereby tie him to the scene of the crimes—was merely cumulative of James and Ashley's identifications of Rushlow and of Rushlow's own testimony that the sweatshirt was his. The trial court did not abuse its discretion in denying Rushlow's request to hire an expert witness at public expense. *See Kocielko v. State*, 938 N.E.2d 243, 255 (Ind. Ct. App. 2010) (no abuse of discretion in denying defendant's motion to hire DNA expert at public expense where the DNA evidence was cumulative and the defendant "failed to provide specifics as to identity, cost, and the precise benefit

to be gained"), *rev'd in part on other grounds on rehearing*, 943 N.E.2d 1282 (2011), *trans. denied*.

## II. Sufficiency of the Evidence

[23] Rushlow claims the State failed to prove that he committed the crimes at issue. When we review the sufficiency of the evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Buelna v. State*, 20 N.E.3d 137, 141 (Ind. 2014). We neither reweigh the evidence nor resolve questions of credibility when determining whether identification evidence is sufficient. *Rutherford v. State*, 866 N.E.2d 867, 871 (Ind. Ct. App. 2007). We will affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed the trier of fact to find the defendant guilty beyond a reasonable doubt. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005).

[24] There is ample evidence from which a reasonable jury could have determined beyond a reasonable doubt that Rushlow committed the crimes. He had a grudge against James for complaining about him to the police and for testifying against him in court. Rushlow threatened Ashley a week before the crimes occurred.

[25] In addition, Ashley told the 911 operator that Rushlow was the shooter, James told Sergeant Lanzen that Rushlow was the shooter, and both Ashley and James identified Rushlow in court as the shooter. Rushlow claims that the validity of their identifications is questionable, but "the reliability of particular

evidence must be gauged by the fact-finder." *Gorman v. State*, 968 N.E.2d 845, 850 (Ind. Ct. App. 2012), *trans. denied*. Any potential errors in eyewitness identification must be resolved during trial, not on appeal. *Id.*

[26] Furthermore, an eyewitness, Landis, saw a person in a dark hooded sweatshirt run away from the site of the shooting. The following morning, a black sweatshirt and a .38 special were found several blocks from James and Ashley's house. Testing revealed that the .38 special could have fired one of the shots into the house, and Rushlow's DNA was found on the sweatshirt. Rushlow admitted at trial that the sweatshirt was his. He testified that someone stole the sweatshirt out of his car three weeks prior to the shooting, but that is a matter of witness credibility for the finder of fact to weigh. The State presented sufficient evidence of identity to sustain Rushlow's convictions.

## III. Appropriateness of Sentence

[27] Rushlow asserts that his sentence is too high and asks this Court to revise it. Article 7, section 4 of the Indiana Constitution authorizes independent appellate review of a sentence even if the trial court acted within its discretion in imposing a sentence. *Rice v. State,* 6 N.E.3d 940, 946 (Ind. 2014). This review is implemented through Appellate Rule 7(B), which states that we may revise a sentence, even if authorized by statute, if "after due consideration of the trial court's decision," the sentence is inappropriate "in light of the nature of the offense or the character of the offender."

[28] The principal role of such review is to attempt to leaven the outliers. *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014), *cert. denied*, 135 S. Ct. 978 (2015). "Sentence review under Appellate Rule 7(B) is very deferential to the trial court." *Conley v. State,* 972 N.E.2d 864, 876 (Ind. 2012). In fact, Appellate Rule 7(B) preserves for the trial court the central role in sentencing. *Kucholick v. State*, 977 N.E.2d 351, 351 (Ind. 2012). The burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Conley*, 972 N.E.2d at 864.

[29] We first note Rushlow's sentence. At the time he committed his crimes, a Class A felony was punishable by imprisonment for a fixed term of between twenty and fifty years, with the advisory sentence being thirty years. Ind. Code § 35-50-2-4 (2005). In addition, a Class C felony was punishable by imprisonment for a fixed term of between two and eight years, with the advisory sentence being four years. Ind. Code § 35-50-2-6 (2005). The trial court sentenced Rushlow to the maximum sentences of fifty and eight years, to be served consecutively. Further, the court directed that Rushlow would serve his aggregate sentence consecutively to his sentence in a federal case that preceded the current charges.

[30] Turning to the nature of the offense, Rushlow argues that James' injury was "minimal" and that the evidence was not more unfavorable to him than what is "generally necessary to establish the offenses of attempted murder and criminal recklessness." Appellant's Br. p. 17. We do not agree. Rushlow's acts placed several persons in danger. He approached a home in the middle of the night

and repeatedly fired a handgun into it. In so doing, he endangered not only James and Ashley, but also their guests, including James' mother, who was sleeping in a room near the front door. Rushlow clearly planned his attack because he pretended to be a police officer in order to lure people to the door. In addition, we share the trial court's concern that Rushlow attacked James and Ashley in retaliation for James' prior testimony in court, which is also an attack on the judicial system. Finally, Rushlow abandoned the handgun in a bush along a street, where it could have been found by anyone, including children.

[31] As for the character of the offender, Rushlow has an extensive criminal record. As a juvenile, he accrued adjudications for acts that would have constituted criminal recklessness and burglary if they had been committed by an adult. As an adult, Rushlow was convicted of possession of a bomb, a Class C felony, false informing, a Class B misdemeanor, and nonsupport of a dependent child, a Class C felony, in Indiana state courts. In addition, he was convicted in federal court of use of a firearm during a crime of violence and of possession of a firearm while being an unlawful user of a narcotic. He has accrued his convictions on a frequent basis, demonstrating an inability to avoid incarceration for more than one or two years at a time. In addition, he has been placed on probation twice as an adult and failed to successfully complete either term. He was on federal probation when he committed the current crimes, and that probation was revoked.

[32] Rushlow argues that positive factors include his employment history and his involvement with his son's little league team. However, his incarcerations have

kept him from being employed for any significant amount of time and have limited his involvement in his children's lives.

[33] Rushlow has failed to carry his burden of demonstrating that his sentence is inappropriate.

# Conclusion

[34] For the reasons stated above, we affirm the judgment of the trial court.

[35] Affirmed.

Baker, J., and Riley, J., concur.