## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Nov 25 2015, 7:28 am
Kevin S. Smith
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Wieneke Law Office, LLC
Plainfield, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Enzert G. Lewis,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 25, 2015

Court of Appeals Case No.
84A05-1503-CR-109

Appeal from the Vigo Superior Court.
The Honorable David R. Bolk, Judge.
Cause No. 84D03-1211-MR-3652

**Friedlander, Senior Judge**

[1] Following a jury trial, Enzert G. Lewis appeals his convictions of altering the scene of a death, a Class D felony,[1] and obstruction of justice, a Class D felony.[2] We affirm.

[2] Lewis raises two issues, which we restate as:

1. Whether there is sufficient evidence to sustain Lewis's conviction for altering the scene of a death.
2. Whether Lewis's convictions for altering the scene of a death and obstruction of justice violate Indiana's constitutional prohibition of double jeopardy.

[3] Lewis physically abused his girlfriend, Allyson. In January and February 2011, Regina Olsen lived with them and saw them argue every day. She also saw Lewis strike Allyson in the face with a closed fist on several occasions. In July 2011, witnesses saw Lewis repeatedly strike Allyson with a closed fist on a public street. The police were called, and they arrested Lewis. In August 2011, police responded to a 911 call from Lewis and Allyson's residence. A detective noticed that Allyson was upset and crying, and she had visible injuries to her

---

[1] Ind. Code section 36-2-14-17(d) (West, Westlaw 2007). The version of the governing statute, i.e., Ind. Code § 36-2-14-17, in effect at the time this offense was committed classified it as a Class D felony. This statute has since been revised and in its current form reclassifies the offense as a Level 6 felony. *See* Ind. Code § 36-2-14-17 (West, Westlaw current with all 2015 First Regular Session of the 119th General Assembly legislation effective through June 28, 2015). The new classification, however, applies only to offenses committed on or after July 1, 2014. *See id.* Because this offense was committed prior to that date, it retains the former classification.

[2] Ind. Code section 35-44.1-2-2 (West, Westlaw 2012). The version of the governing statute, i.e., Ind. Code § 35-44.1-2-2, in effect at the time this offense was committed classified it as a Class D felony. This statute has since been revised and in its current form reclassifies the offense as a Level 6 felony. *See* Ind. Code § 35-44.1-2-2 (West, Westlaw current with all 2015 First Regular Session of the 119th General Assembly legislation effective through June 28, 2015). The new classification, however, applies only to offenses committed on or after July 1, 2014. *See id.* Because this offense was committed prior to that date, it retains the former classification.

neck. Allyson seemed fearful and kept looking in Lewis's direction. Lewis was arrested.

[4] Lewis and Allyson married in May 2012. Nikkaray Hughes lived with them in September 2012. She saw them argue frequently and saw Lewis shove Allyson several times. Hughes heard Lewis tell Allyson, "It was till [sic] death do us part, and he meant it." Tr. p. 655.

[5] Later in September 2012, Lewis and Allyson separated, and Allyson stated that she wanted a divorce. Allyson stayed in what had been their home, an apartment on Fourteenth Street in Terre Haute. Lewis moved in with his cousin, Lincoln Shaw, who also lived in Terre Haute. Although Lewis moved out of the apartment, he stopped by Allyson's apartment "almost every day" to see if she was there. *Id.* at 657. Lewis accused Allyson of cheating on him. Allyson tried to avoid Lewis.

[6] Lewis and Allyson had missed several rent payments on the Fourteenth Street apartment. They went to their landlord's office on October 3, 2012, and the office manager told them to move out by the following weekend.

[7] On October 6, Lewis and Allyson attended a homecoming celebration with Shaw and several other people. On October 9, 2012, an employee of the landlord delivered moving boxes to Allyson at the apartment. Also in early October, Allyson's neighbor Janice Tetrick saw Allyson get into a car with Lewis. Tetrick never saw Allyson again, but she saw Lewis enter Allyson's apartment every second or third day after that. He used a key to enter.

[8] Donald M. Riley was Lewis's friend and operated a car washing and detailing business. Detailing a car consists of shampooing the carpets, seats, and trunk, cleaning the engine, and washing the exterior. In early October, a few days after the October 6 homecoming celebration, Lewis arrived at Riley's business and asked Riley to detail his car. In the past, Riley had washed the exterior of Lewis's car, but Lewis had never asked Riley to detail it. Riley declined Lewis's request because he had just closed for the day.

[9] During the same period of time after the homecoming celebration, Shaw noted that his cousin, Lewis, was absent for two to three days and did not answer his phone. When Lewis returned to Shaw's house, Lewis looked tired, worried, and had red eyes. He walked with a limp and had a swollen left hand. Shaw asked him where he had been. Lewis told Shaw he had been in Greencastle with a supervisor from work and a girl. He also told Shaw "I done [sic] the bitch." *Id.* at 1594.

[10] In October 2012, Aaliyah Ward encountered Lewis. He said that he and Allyson had a court date, but Allyson "was never gonna make it to court." *Id.* at 538. During that same month, Katie Wallace spoke with Lewis, and he asked her, "How do you divorce someone who is dead?" *Id.* at 578. Wallace observed that one of the knuckles on his left hand was cut.

[11] Lewis worked at a factory in Brazil, Indiana. In early to middle October 2012, Lewis informed his employer's human resources administrator that Allyson was

divorcing him and he would have to move. A week later, Lewis told the same person, "Allyson is no more." *Id.* at 886.

[12] On October 15, 2012, an employee of Allyson's landlord entered the apartment to check its condition. No one was home. Food had been left sitting out on a table. Clothes were scattered on the floor in the bedroom and were hung up in the bedroom closet. By contrast, the bathroom was clean.

[13] On November 3, 2012, Lewis arrived at Olsen's home. He said that Allyson had left town and would not be coming back. Lewis also told Olsen that she could take anything she wanted from the Fourteenth Street apartment. Lewis, Olsen, and several of her acquaintances went to the apartment. Allyson's work identification card, clothing, jewelry, photographs, computer, and furniture were still there. The situation was "suspicious" to several of the people who accompanied Olsen. *Id.* at 867. Olsen took some of Allyson's personal items out of the apartment for safekeeping, and her companions took some of the furniture.

[14] On the afternoon of November 3, 2012, a person found a badly decomposed body in rural Vigo County. The body was twenty feet from a road, in a shallow ditch. Brush and a guardrail along the road prevented the body from being easily seen.

[15] Detective Jason Fischer of the Vigo County Sheriff's Department was dispatched to the scene to collect evidence. The body was dressed in pants and underwear but no shirt. It appeared to Detective Fischer from the way that the

body was positioned that it had been dumped there. Detective Fischer saw insect larvae on the body. He called Dr. Neal Haskell, a forensic entomologist, for advice, and then he and another officer collected some of the larvae as directed by Dr. Haskell.

[16] Detective Fischer and other officers returned to the scene two days later to examine the surroundings in daylight. He found a plastic bag that contained an empty one-gallon bottle. The bottle had contained bleach. The bag and the bottle were on the other side of a fence from the body, approximately forty feet away. Detective Fischer determined that the bottle had been left there recently.

[17] Meanwhile, Dr. Roland Kohr conducted an autopsy on the unidentified body on November 5, 2012. During his examination, Dr. Kohr ascertained that the upper jaw and the lower half of the skull, "from the mid-point of the nose down," were detached from the rest of the skull. *Id.* at 773. Most of the teeth were missing, and both orbital bones, which frame the eyeballs, were damaged. It was "a highly unusual injury." *Id.* That injury was the cause of death, and it resulted from a "very concentrated force" being applied to that portion of the face. *Id.* at 791. A person wearing steel-toed boots could have inflicted the injury with a kick or by stomping on the face with a boot's heel. The injury would have resulted in heavy bleeding, instant unconsciousness, and death within minutes.

[18] In Dr. Kohr's opinion, the body had been transported to the location where it was found. The body was found 4.2 miles south of U.S. Highway 40. That

highway was the most direct route between Lewis's residence and his place of work.

[19] On November 6, 2012, Allyson's mother heard on the news that a body had been discovered. She had not spoken with Allyson since September and was concerned, so she called the police. Allyson's dental records were obtained, and a forensic odontologist confirmed that the body was Allyson's.

[20] Also on November 6, Lewis approached his cousin, Shaw, and told Shaw that he saw on the news that Allyson's body had been found. Lewis further stated that he had killed Allyson by kicking her in the face. Lewis told Shaw that he threw away his bloody clothes and his cellphone. Officers took Lewis into custody that night and impounded the car he had been driving.

[21] Later on November 6, 2012, police officers searched Allyson's apartment pursuant to a search warrant. There was mail in the mailbox. The most recent mail bore a postmark of October 18. In the kitchen, someone had put pieces of cardboard in the windows, which blocked the view into the room. None of the other windows in the apartment were blocked. Officers discovered a paint tray, cans of paint, and paint rollers in the kitchen. The color of paint on the kitchen walls matched the color of the paint on the rollers and in the paint tray. A bowl containing a substance later determined to be bleach was sitting on the stove, and officers later discovered a bottle of bleach in a cabinet. There were dirty dishes in the kitchen sink. Officers found a trash bag that contained, among other items, Allyson's Social Security card. It had been torn into pieces.

[22] Elsewhere in the apartment, the bathroom was clean. The living room did not contain any furniture, but there was a bag of trash that contained, among other items, washrags that were stained with bleach and Allyson's Work One unemployment benefit card. Allyson's clothes and some of her personal items were still present in the bedroom.

[23] Next, the officers brought to the apartment two dogs that were trained to locate the odor of human cadaver material, including trace amounts of blood. The dogs were separated and allowed into the apartment one at a time. Both dogs alerted to the odor of cadaver material in the kitchen. In addition, one of the dogs alerted to the odor of cadaver material in the bathroom.

[24] The dogs were taken to Shaw's house, where Lewis had been living. Again, the dogs were allowed into the house one at a time. The first dog alerted to the odor of cadaver material in the closet of Lewis's bedroom. A police officer began to move clothes from the closet onto Lewis's bed, but the dog's handler stopped the officer because she was worried that the scent of cadaver material could transfer to the bed. The items were returned to the closet, and the dog was unable to pinpoint the source of the odor.

[25] When the second dog entered Shaw's house, it went to Lewis's bedroom. That dog alerted to the odor of cadaver material in the closet. It also alerted to the presence of the odor on the bed. That dog also could not pinpoint the source of the odor in the closet.

[26] Finally, both dogs were taken to Lewis's car, which the police had kept in a secure location. The dogs were allowed to sniff the car separately. One of the dogs alerted to the odor of cadaver material in the car, on the passenger side. Officers searched the car and found a bottle of bleach and a bottle that contained an unspecified caustic liquid.

[27] The police seized several items they found in Allyson's apartment, Lewis's bedroom, and Lewis's car. They sent those items, along with some of the items they found near Allyson's body, to the State Police Laboratory for DNA testing. Testing did not yield any incriminating information. Forensic biologist Angela Gibbs, who performed the testing, indicated that in her experience the presence of bleach on an item can hinder the process of generating a DNA profile for analysis.

[28] Dr. Haskell, the forensic entomologist who Detective Fischer had called for advice, was present at the autopsy with several students from the forensic science course he taught. During the autopsy, one of the students collected insect specimens from Allyson's body under Dr. Haskell's direction. Next, Dr. Haskell accompanied police officers to the spot where the body had been found and collected additional specimens. He has a process for estimating when insects began to colonize a body, which is to say when a person died, based on an analysis of the types of insects found on the body, their ages, and the weather conditions in the area where the body was found. Based upon his analysis of the specimens that were collected on November 3 and November 5

and the weather conditions, Dr. Haskell concluded that insects began to colonize Allyson's body between October 4 and October 11, 2012.

[29] The police questioned Lewis on the night of November 6, 2012. He said that he last saw Allyson in September and had not been back to the apartment after he moved out on September 16. Lewis was jailed. During Lewis's incarceration, he told fellow inmate Brian Thompson that he had killed Allyson and that, at the time of her death, he had a pending criminal case involving Allyson. Lewis further stated that he had dumped Allyson's body on the way to work and that he was worried about his fingerprints being found on a bleach bottle that he had left at the scene. Lewis also told Thompson that he had cleaned his car and an apartment with bleach and had discarded his cellphone.

[30] The State charged Lewis with murder, altering the scene of a death, obstruction of justice, and invasion of privacy. The trial court severed the invasion of privacy charge from the other charges. A jury determined that Lewis was guilty of murder, altering the scene of a death, and obstruction of justice. The trial court imposed a sentence, and this appeal followed.

1.

[31] Lewis argues that there is insufficient evidence to sustain his conviction of altering the scene of a death. When we review the sufficiency of the evidence to support a criminal conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Buelna v. State*, 20 N.E.3d 137 (Ind. 2014). We neither reweigh the evidence nor assess witness credibility. *Id.*

We will affirm the conviction unless no reasonable factfinder could conclude the elements of the crime were proven beyond a reasonable doubt. *Id.* A verdict may be sustained by circumstantial evidence alone if that circumstantial evidence supports a reasonable inference of guilt. *Houston v. State*, 730 N.E.2d 1247 (Ind. 2000).

[32] To convict Lewis of altering the scene of a death as charged, the State was required to prove beyond a reasonable doubt that: (1) Lewis (2) with the intent to hinder a criminal investigation (3) and without the permission of the coroner or a law enforcement officer (4) knowingly or intentionally (5) altered (6) Allyson's scene of death (7) after Allyson died from violence and/or in an apparently suspicious, unusual, or unnatural manner. Ind. Code § 36-2-14-17.

[33] In this appeal, there is no dispute that Lewis murdered Allyson. Detective Fischer and Dr. Kohr both testified that Allyson was not murdered at the spot where her body was found, but that someone had dumped her body there. Furthermore, dogs that were trained to detect human cadaver material, including blood, detected such material in the kitchen of her apartment and in Lewis's room at his cousin's home. One of the dogs detected human cadaver material in Lewis's car. In addition, Lewis told Thompson that he had dumped Allyson's body on his way to work and thoroughly cleaned his car and an apartment. Lewis had asked a friend to detail his car. The body was found 4.2 miles south of U.S. Highway 40, which was the most direct route between Lewis's residence and his workplace. This evidence is sufficient to establish

beyond a reasonable doubt that Lewis altered the scene of a death by moving Allyson's body after murdering her.

[34] Lewis points to an expert witness's testimony that the dogs' detection of human remains is merely presumptive and should be confirmed with further testing. This is a request to reweigh the evidence, which our standard of review forbids. The evidence is sufficient to sustain Lewis's conviction.

2.

[35] Lewis claims that his convictions for altering the scene of a death and obstruction of justice violate Indiana's constitutional prohibition of double jeopardy. Article I, section 14 of the Indiana Constitution provides, in relevant part: "No person shall be put in jeopardy twice for the same offense." We review de novo whether a defendant's convictions violate the Indiana Double Jeopardy Clause. *Glenn v. State*, 999 N.E.2d 859 (Ind. Ct. App. 2013).

[36] Two or more offenses are the "same offense," in violation of section 14, if the essential elements of one challenged offense also establish the essential elements of another challenged offense. *Sistrunk v. State*, 36 N.E.3d 1051 (Ind. 2015). We may consider the statutory elements of the challenged crimes or the actual evidence used to convict the defendant of those crimes. *Id.*

[37] Lewis concedes that the statutory elements of the two crimes are not the same and instead asserts that the same evidence was the basis for both of his convictions. Under the "actual evidence" portion of Indiana's Double

Jeopardy Clause analysis, we must determine whether there is a reasonable possibility that the evidentiary facts used by the fact-finder to establish elements of one offense may have also been used to establish the essential elements of a second challenged offense. *Sloan v. State*, 947 N.E.2d 917 (Ind. 2011). Application of the actual-evidence test requires a reviewing court to look at the evidence presented at trial and decide whether each challenged offense was established by separate, distinct facts. *Id.* It is appropriate to consider the charging information, jury instructions, and arguments of counsel. *Lee v. State*, 892 N.E.2d 1231 (Ind. 2008). Section 14 permits convictions for multiple offenses committed in a protracted criminal episode when the case is prosecuted in a manner that ensures that multiple guilty verdicts are not based on the same evidentiary facts. *Garrett v. State*, 992 N.E.2d 710 (Ind. 2013).

[38] The State contends that Lewis committed the crime of altering the scene of a death by moving Allyson's body and separately committed the crime of obstruction of justice by cleaning Allyson's apartment to conceal the murder. The State further argues that the jury was informed that each crime was supported by separate evidence and was provided with the evidence.

[39] In the charging information, the State alleged that Lewis committed the offense of altering the scene of death by "alter[ing] the scene of death of Allyson Lewis." Appellant's App. p. 25. The State further alleged that Lewis committed the offense of obstruction of justice by "removing and/or destroying evidence related to the death of Allyson Lewis, nee Elmi including but not limited to teeth, blood, and other trace evidence." *Id.* Thus, the information

specified that Lewis obstructed justice by cleaning up her blood and teeth. The trial court included the charging information in its preliminary and final jury instructions.

[40] The court also separately defined the offenses of altering the scene of a death and obstruction of justice in its jury instructions. In relevant part, the court instructed the jury that Lewis was alleged to have committed altering the scene of a death by "Alter[ing] the scene of the death of Allyson Lewis, nee Elmi." *Id.* at 388, 411. The court further stated that Lewis was alleged to have committed obstruction of justice by "Alter[ing], damag[ing] or remov[ing] . . . A record, document, or thing . . . With intent to prevent it from being produced or used as evidence in an official proceeding or investigation." *Id.* at 389, 412.

[41] At trial, the State presented separate evidence for each conviction. The State established that Lewis moved Allyson's body from the scene of the murder, her apartment, to rural Vigo County. The State then established that Lewis thoroughly cleaned Allyson's apartment and his car to eliminate all traces of the murder, including her blood.

[42] Finally, we turn to counsel's arguments. During the State's rebuttal closing argument, the prosecutor told the jury:

> There has been a substantial amount of evidence of why we know the Defendant murdered his wife, Allyson. And the other charges go right along with it. When you look at those, same thing. We know the body was moved; we know evidence was destroyed; it's a matter of who did it. The killer did it. The Defendant.

Tr. pp. 1713-14.

[43] The State's closing argument adequately informed the jury which separate acts supported the offenses of altering the scene of a death and obstruction of justice, and the State provided ample evidence in support of both charges. Lewis has not established a reasonable possibility that the jury used the same evidence to support both convictions, and his double jeopardy claim must fail. *See Ellis v State*, 29 N.E.3d 792 (Ind. Ct. App. 2015) (State's evidence and arguments to the jury established that there was no violation of the actual evidence test), *trans. denied*.

[44] For the reasons stated above, we affirm the judgment of the trial court.

[45] Judgment affirmed.

Robb, J., and Pyle, J., concur.