Ronald POLING, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 27A02–0601–CR–32.

Court of Appeals of Indiana.

Sept. 20, 2006.

Jerry T. Drook, Marion, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Ryan D. Johanningsmeier, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

■ Ronald Poling appeals his convictions for three counts of neglect of a dependent as a class C felony. We affirm in part, reverse in part, and remand.[1]

### Issues

The dispositive issues are as follows:

I.  Whether Indiana Code Section 35–46–1–4 violates the Proportionality Clause of the Indiana Constitution; and

II. Whether Poling's convictions for six neglect offenses violate the Indiana Constitution's prohibition against double jeopardy.

### Facts and Procedural History

In October 2004, Poling moved into the Marion home of his girlfriend, Nancy Mullins, and her four children—ten-year-old P.M., six-year-old A.M., five-year-old V.T., and three-year-old Z.T. Before Poling moved in with Mullins, she disciplined her children with "time outs"—periods of time in which they were sent to their bedrooms after misbehaving. After he moved in to the house, however, Poling began implementing his own methods of discipline, which included forcing the three older children to stand with their noses against the wall and their arms outstretched holding 14.5–ounce cans of food. If P.M. or A.M. dropped a can or started crying, Poling would spank them or force them to hold a 46–ounce can. On at least one occasion, Poling hit P.M.'s hand across the knuckles with a hammer.

Poling also placed locks on the outside of the children's bedroom doors and locked them in their rooms at night. The children would sometimes be forced to urinate on themselves when Poling would not open the door for them to use the restroom. Poling also "hog-tied" the three older children with duct tape. He put duct tape over their mouths, wrapped the tape around their heads, taped their wrists together and their legs together, and then taped their wrists to their feet. P.M. was taped on at least two occasions, while A.M. and V.T. were each taped at least once.

P.M.'s third-grade teacher, Jennifer Wiggin, noted that P.M.'s behavior changed from being "bubbly" and "outspoken" in August 2004 to being "very negative," "angry," and physically violent in November 2004. Tr. at 48–50, 89, 116. P.M. appeared "very pale, very thin" and often came to class smelling of urine. *Id.* at 52. He was "constantly obsessed with food." *Id.* at 54. He often complained about his body hurting, and his lips were sometimes chapped. He frequently complained about being cold.

A.M.'s first-grade teacher, Diana Grogg, often noticed that A.M. had dark circles around his eyes and that he was "very pale" and smelled of urine. *Id.* at 730. A.M. told Grogg that if he got in trouble at school, he would be spanked at home and sent to bed with no dinner.

Wiggin and Grogg reported their observations to Charlotte Penrod, the school's social service specialist. On December 15, 2004, Penrod spoke with P.M. Penrod was "very concerned" about P.M.'s well-being after speaking with him, and she immediately called the Grant County Department of Child Services ("DCS"). *Id.*

---

1. We acknowledge receipt of Poling's Motion to Overturn Conviction filed May 1, 2006, and his Motion to Respond filed August 10, 2006. To the extent that Poling attempts to raise new issues for our review in these motions, we decline to consider them. *See* Ind. Appellate Rule 46(C) (no new issues may be raised in a reply brief).

at 148. On December 17, 2004, DCS investigator Brian Trout went to Poling and Mullins's house with a deputy sheriff to perform a home inspection based on Penrod's report. Trout observed Mullins let Z.T. out of a locked "time out" closet. The closet was dark and measured 8'3" by 3'5". Trout observed padlocks on all the kitchen cabinets, the refrigerator, and the freezer. The children's bedrooms had sliding locks on the doors. Trout noticed that V.T. and Z.T. were "very thin, very pale." *Id.* at 334.

At this first meeting, Trout instructed Poling and Mullins that it was inappropriate to discipline the children by withholding food. He also told them to remove all the locks from the children's bedroom doors. He explained that keeping the children locked in their rooms prevented proper supervision of their behavior and could endanger their lives in the event of a fire. Poling and Mullins agreed to participate in a parenting program. Trout also scheduled an appointment for the children to be examined by a physician.[2] On January 10, 2005, Trout again met with Poling to discuss the written informal adjustment he had prepared for their signature. Trout advised Poling and Mullins that DCS would file a CHINS petition if they failed to follow the recommendations set forth in the informal adjustment.

In mid-January 2005, Poling, Mullins, and the children moved to a new house in Marion. The three boys shared a bedroom, which had an alarm on the door that would sound if any of the boys left the room. There were two "time out rooms" in the house. One was a dark closet, and the other was a room in which the family's dogs lived. If a child was locked in this room overnight, he or she had to use the dogs' bedding. The only water or food was what was in the dogs' bowls, and there was urine and feces all over the concrete floor. As in the first house, the kitchen cabinets, freezer, and refrigerator were padlocked to prevent the children's access to food. V.T.'s bed was next to a gas hot water heater with an open flame.

P.M. and A.M. began attending a new school. P.M.'s third-grade teacher, Deborah Butts, described P.M. as having emotional and discipline problems. She noticed that he ate his school breakfasts and lunches "very quickly" and that he stole candy from her and frequently asked for snacks. *Id.* at 123–25, 133. P.M. appeared "unkempt," and he would wear the same clothes on multiple days. *Id.* at 126. His skin was pale, and he had "dark bags" under his eyes. *Id.* When Butts asked P.M. why he was tired, he would say that he had slept on the floor again. Butts notified Dee Fields, the school's social services coordinator, of her concerns about P.M.'s condition.

Shelli Pence, A.M.'s first grade teacher at the new school, noticed that A.M. "[p]retty much scarfed down whatever was in front of him." *Id.* at 737. He would often ask for more food, complain of his hunger, and save food to take home. He often came to class dirty and had pale skin, dark circles under his eyes, and "real dull" hair. *Id.* at 739. Pence reported her concerns to Fields as well.

Approximately two weeks after Trout's January 10, 2005, meeting with Poling and Mullins, the matter was referred to DCS caseworker Peggy Bradley. On or about January 26, 2005, Bradley received a call from an official at P.M. and A.M.'s school, indicating that the boys were hungry. She visited Poling and Mullins in their new home on that date, and Poling stated that

---

**2.** The physician later reported that he had detected no health problems in any of the children and described them as "well." Tr. at 369–70.

he did not like having the school and DCS "in his business." *Id.* at 410, 412. She visited the home again on January 27, 2005, and January 28, 2005, in response to additional reports from the school. On the last day, Poling advised Bradley that he did not want to cooperate with DCS anymore. Bradley asked Mullins to "think it over" before making a final decision, and Mullins responded, "I will go along with [Poling]. We're done. Get out of the house." *Id.* at 421.

On January 31, 2005, Trout and several Grant County Sheriff's officers served a CHINS order on Poling and Mullins at their house. Poling screamed and yelled profanities at Trout. He told Trout that he had "a[n] ass whipping coming" and that he was going to hunt him down and beat him. *Id.* at 352–53. He threatened Trout for approximately twenty minutes. Poling instructed the children to hit and kick Trout and the officers as they took the children into protective custody.

On April 8, 2005, the State charged Poling with three counts of neglect of a dependent as a class C felony, three counts of neglect of a dependent as a class D felony, and one count of intimidation as a class A misdemeanor. On July 15, 2005, a jury found Poling guilty on all counts. The trial court sentenced Poling to three consecutive four-year terms for the class C

felony convictions, with one four-year term suspended. The court also sentenced Poling to one and one-half years for each class D felony conviction and one year for the misdemeanor conviction, with all these sentences to be served concurrent with each other and with the class C felony sentences. Poling now appeals.

## Discussion and Decision

### I. Unconstitutionality of Indiana Code Section 35–46–1–4

Poling argues that the statute under which he was convicted for class C felony neglect, Indiana Code Section 35–46–1–4, is unconstitutionally vague.[3] A statute is void for vagueness if its prohibitions are not clearly defined. *Logan v. State*, 836 N.E.2d 467, 473 (Ind.Ct.App. 2005). Here, it is true that the statute does not clearly define what constitutes "unusual" confinement. However, we think that Poling's stronger argument involves the sentencing portion of the statute, specifically the possibility that a defendant may be convicted of a C or D felony for the same crime.[4] Therefore, his constitutional challenge would be more appropriately framed as whether the statute violates the Proportionality Clause, Article 1, Section 16, of the Indiana Constitution.[5] Our standard of review is well settled.

---

3. The State argues that Poling waived his constitutionality claim because he failed to raise it at trial. We note, however, that a party may raise the issue of a statute's constitutionality at any stage of a proceeding, and this Court may also raise the issue *sua sponte*. *Cooper v. State*, 760 N.E.2d 660, 664 (Ind.Ct. App.2001), *trans. denied* (2002). Therefore, we will address Poling's argument on this issue.

4. Poling argues in part that the Indiana Code Section 35–46–1–4 is unconstitutionally vague because it requires proof of "cruel" confinement for a D felony conviction while it requires proof of the additional element of

"unusual" confinement for a C felony conviction. Because "unusual" is not defined in the statute, he claims that a person of ordinary intelligence cannot comprehend the conduct proscribed. This portion of his argument is misguided however, as Poling relies upon the "cruel *and* unusual" interpretation set forth in the trial court's instructions. Rather, the language of the statute is "cruel *or* unusual," so this portion of his claim is not particularly persuasive (emphasis added). *See* Ind.Code § 35–46–1–4(b).

5. We note that, although Poling does not raise an equal protection challenge, Indiana Code

Every statute stands before us clothed with the presumption of constitutionality until clearly overcome by a contrary showing. The party challenging the constitutionality of the statute bears the burden of proof, and we resolve all doubts against that party. If there are two reasonable interpretations of a statute, one of which is constitutional and the other not, we will choose that path which permits upholding the statute because we will not presume that the legislature violated the constitution unless such is required by the unambiguous language of the statute.

*Logan v. State*, 836 N.E.2d 467, 473 (Ind. Ct.App.2005) (citations omitted), *trans. denied* (2006).

■ With regard to the Proportionality Clause, our supreme court has held that a finding of unconstitutionality should be reserved for "penalties so disproportionate to the nature of the offense as to amount to clear constitutional infirmity sufficient to overcome the presumption of constitutionality afforded to legislate decisions about penalties." *State v. Moss–Dwyer*, 686 N.E.2d 109, 112 (Ind.1997) (quotations and citations omitted). The statute at issue in this case—Indiana Code Section 35–46–1–4—says in pertinent part:

(a) A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally:

   (1) places the dependent in a situation that endangers the dependent's life or health;

   (2) abandons or cruelly confines the dependent;

   (3) deprives the dependent of necessary support;

   (4) deprives the dependent of education as required by law; commits

neglect of a dependent, a Class D felony.

(b) However, the offense is:

   . . .

   (5) a Class C felony if it is committed under subsection (a)(2) and consists of cruel or unusual confinement or abandonment.

The trial court itself noted the statute's confusing language during a discussion of jury instructions at trial:

The problem I have with the statute as it now reads is it makes it a D felony for someone to, uh, cruelly confine a dependent, and then on down to Section ( [b] )(4), it makes it a Class C felony if someone cruelly confines a dependent. So, to me those read exactly the same. You have the same elements, and yet in subsection ( [b] )(4), if they find, if the jury finds, um, that the confinement is cruel, it could enhance a D felony to a C felony, which makes absolutely, uh, no sense to me. Uh, I think the instructions, the information and the instruction now, um, in a way cure the defect, uh, because the way we now have the instructions for the jury they can find that a D felony has been committed. If they find that the defendant knowingly or intentionally confined one (1) of the three (3) child victims in this case. It makes it a D felony only if they are, or a C felony, it enhances it to a C felony, only if they find that, uh, in addition to cruelly confining the dependent that the offense also consisted of unusual confinement. . . . I would also note just for the record that, uh, the, uh, pattern instruction regarding this particular crime and this particular statute also seem to not catch what we believe, or what I believe to be, uh, a problem, uh,

Section 35–46–1–4 would likely fail under such an analysis as well.

with the statute. So, hopefully that can be remedied in the future.

Tr. at 9–10. In light of its concerns about the language of Indiana Code Section 35–46–1–4, the trial court worded its final jury instructions on Counts I, II, and III as follows:

The crime of neglect of a dependent is defined by law as follows:

A person having the care of a dependent whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally cruelly confines the dependent commits neglect of a dependent, a class D felony. *The offense is a class C felony if the cruel confinement consists of unusual confinement.*

Before you may convict the Defendant of Count [I, II or III], the State must have proved each of the following beyond a reasonable doubt:

1. The Defendant
2. knowingly or intentionally
3. cruelly confined [the dependent]
4. when [the dependent] was a dependent and when Defendant had the care, custody or control of [the dependent], whether assumed voluntarily or because of a legal obligation
5. *and the offense consisted of unusual confinement.*

If the State failed to prove each of these elements beyond a reasonable doubt, you must find the Defendant not guilty of neglect of a dependent, a Class C felony charged in Count [I, II or III].

Appellant's App. at 106–111 (emphases added).

Clearly, this instruction required the State to prove that Poling's confinement of the children was both "cruel" *and* "unusual" in order to convict him of class C felony neglect. This standard obviously differs from that set forth in the plain language of Indiana Code Section 35–46–1–4, which states that a person can be convicted of a class C felony for "cruel *or* unusual confinement" of a dependent.[6] (Emphasis added.) As the statute is now written, if a jury finds a defendant guilty of cruel confinement of a dependent, the jury can characterize the crime as either a class C or class D felony. Consequently, one defendant can receive a harsher sentence than another for the very same crime.

Indiana caselaw dealing with the Proportionality Clause has primarily involved situations where the defendant argues that a less serious crime garners a more severe punishment than a more serious crime. *See, e.g., Laughner v. State,* 769 N.E.2d 1147, 1156 (Ind.Ct.App.2002) (comparing legislature's characterization of solicitation of a child over the internet as a class C felony versus solicitation of a child in person as a class D felony); *Conner v. State,* 626 N.E.2d 803 (Ind.1993) (holding that statute was unconstitutional where penalty for selling fake marijuana was more severe than penalty for selling real marijuana, which contradicted pattern of punishing real drug dealing more harshly than fake drug dealing). However, at least one other jurisdiction has found that its proportionality clause was violated where offenses with identical elements were given

---

**6.** We recognize that the trial court was "between a rock and a hard place" here. If its jury instructions stated the law of Indiana Code Section 35–46–1–4 as written, the jury would have been permitted to find Poling guilty of a class C felony or a class D felony using the same elements. Thus, the court chose not to follow the language of the statute, in hopes of providing the jury with less confusing instructions. Clearly, however, the trial court recognized the potential controversy regarding this decision, as it commented that its discussion of the jury instructions and the reasoning behind them was "for the record for the Court of Appeals." Tr. at 9.

different sentences. *See People v. Christy*, 139 Ill.2d 172, 151 Ill.Dec. 315, 564 N.E.2d 770, 774 (1990). In *Christy*, the Illinois Supreme Court reviewed a defendant's conviction and sentence for armed violence predicated on kidnapping, which carried a sentencing range of six to thirty years. The crime of aggravated kidnapping, which had identical elements to the armed violence offense, carried a penalty of four to fifteen years. While the State argued that it was within prosecutorial discretion to choose which offense to charge the defendant with, the Illinois Supreme Court concluded that skilled prosecutors would usually seek the more severe sentence, and thus the aggravated kidnapping statute would effectively be nullified. "Since the elements which constitute aggravated kidnapping and armed violence are identical, common sense and sound logic would seemingly dictate that their penalties be identical." *Id.* Similarly, in the instant case, the crimes of neglect of a dependent as a class C felony and neglect of a dependent as a class D felony, each carrying a different sentencing range, can be proven with identical elements. Prosecutors would likely pursue the C felony charge, and thus a longer sentence, for defendants charged with this crime.

Because we agree with Poling that Indiana Code Section 35–46–1–4 is unconstitutional, we hereby reduce his three class C felony convictions to class D felony convictions and remand with instructions to the trial court to resentence Poling accordingly.[7] We share the trial court's hope that the legislature will revisit Indiana Code Section 35–46–1–4 for the purpose of clarifying and distinguishing the elements of neglect of a dependent as a C felony and neglect of a dependent as a D felony so as to comply with Indiana's Proportionality Clause.[8]

## II. Double Jeopardy

■ Poling was convicted of six counts of neglect of a dependent—two related to his treatment of P.M., two related to his treatment of A.M., and two related to his treatment of V.T. He claims that the State violated the double jeopardy clause of the Indiana Constitution by using the same evidence to prove both counts related to each victim and that, therefore, only one conviction as to each victim should stand. Two offenses are the "same offense" in violation of Article 1, Section 14 of the Indiana Constitution if, "with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson v. State*, 717 N.E.2d 32, 49 (Ind.1999). The State presented evidence that Poling hog-tied P.M., A.M., and V.T. with duct tape on at

7. Because we find in Poling's favor on his constitutionality argument, we need not address his claim that the evidence was insufficient to prove the element of "unusual" confinement under Indiana Code Section 35–46–1–4.

8. We take this opportunity to advise the legislature that the State's interpretation of "unusual" as an *additional* (rather than alternative) element necessary to prove neglect of a dependent as a class C felony is not an appropriate solution to the problem with this statute. In our view, whether an act of confinement or abandonment is unusual is irrelevant to the seriousness of the crime. For example, would it be fair to order a lesser sentence for a defendant who cruelly confined his dependent in an "ordinary" manner versus a defendant who did so in an "unusual" way? And how would one determine what "unusual" means in this context? Using examples from the instant case, would confinement in a locked closet be considered unusual? Would confinement by duct tape be considered unusual? We encourage the legislature to consider these issues if and when it revises the statute.

least one occasion. This evidence supported the jury's determination that Poling "knowingly or intentionally cruelly confine[d]" each of the victims, pursuant to Counts I, II, and III. The State also presented evidence that Poling locked each of the three victims in a closet for an extended period of time on at least one occasion. This evidence supported his convictions for "knowingly or intentionally plac[ing] the dependent[s] in a situation that endanger[ed their] life or health," pursuant to Counts IV, V, and VI.[9] There was no double jeopardy violation here.

Affirmed in part, reversed in part, and remanded.

KIRSCH, C.J., and BAILEY, J., concur.

---

**9.** In his brief, Poling concedes that the evidence that he struck P.M.'s hand with a hammer was evidence distinct from that of his acts of confining the children and thus supported his conviction under Count IV.