# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 22 2016, 5:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Henry A. Flores, Jr.
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Morgan Christopher Foster, *Appellant-Defendant,* | September 22, 2016 |
| | Court of Appeals Case No. 82A05-1511-CR-2010 |
| v. | Appeal from the Vanderburgh Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Robert J. Pigman, Judge |
| | Trial Court Cause No. 82D03-1504-F3-2026 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Morgan Foster was convicted of conspiracy to commit dealing in methamphetamine as a Level 2 felony and was sentenced to twenty-two and one-half years in the Indiana Department of Correction. Foster appeals his conviction and sentence, raising five issues for our review, which we restate as (1) whether the trial court abused its discretion in admitting evidence, (2) whether the evidence is sufficient to support his conviction, (3) whether his conviction violates the prohibition against double jeopardy, (4) whether his sentence violates Indiana's Proportionality Clause, and (5) whether his sentence is inappropriate in light of the nature of the offense and his character. Concluding the trial court did not abuse its discretion in admitting evidence, the evidence is sufficient to support Foster's conviction, his conviction does not violate the prohibition against double jeopardy, and his sentence is neither unconstitutional nor inappropriate, we affirm.

# Facts and Procedural History

[2] In early April 2015, Foster was attempting to locate pseudoephedrine pills to manufacture methamphetamine. A confidential informant and Foster agreed to an exchange. The confidential informant notified Detective Todd Seibert of the Evansville Police Department of the agreement with Foster. Detective Seibert then set up a controlled buy between the informant and Foster.

[3] On April 7, 2015, Detective Seibert provided the informant with 100, 120 milligram pseudoephedrine pills. Around 4:00 p.m., the informant arrived at Foster's home. The informant told Foster she wanted three grams of methamphetamine in exchange for the pills. Foster did not have any methamphetamine at the time, but stated he would "be started by 7:00 [and] be done no later than 11:00." Transcript at 377. Foster provided the informant with his personal property as collateral and explained he would call the informant "[n]o later than 11:00." *Id*. at 380. During the conversation, Demareo Thurston called Foster and Foster demanded Thurston come to the home, claiming he was "ready to go."[1] *Id*. at 377. The informant gave Foster all 100 pills and left. Detectives Seibert, Patrick McDonald, and Brock Hensley then conducted surveillance on the home.

[4] Later that evening, Thurston arrived at Foster's home with camping fuel. Foster then requested Thurston purchase sodium hydroxide (lye) and a one-gallon plastic bottle. Thurston obliged, and returned with sodium hydroxide, a one-gallon plastic container, and coffee filters. In exchange for his time, Thurston was hoping to receive at least one gram of methamphetamine.

[5] At some point, Detective Seibert walked around the home and noticed a strong chemical odor emanating from the back of the home. Through his training and experience, Detective Seibert believed the odor was indicative of the

---

[1] Thurston testified Foster called him a day before the controlled buy and requested Thurston obtain camping fuel, a common precursor used in the manufacturing of methamphetamine.

manufacturing of methamphetamine. Unbeknownst to Detective Seibert, other police officers received a report of a chemical odor emanating from the home around the same time. When those police officers arrived, Detective Hensley called the officers and requested they attempt to contact Foster and Thurston. The police officers also noticed a strong chemical odor coming from the home. After no one answered the door, the police officers left. Shortly thereafter, Thurston and Foster also left. Police officers were able to locate the pair and Detective Seibert spoke with Foster. Detective Seibert detected a strong chemical odor generally associated with the manufacturing of methamphetamine coming from Foster.

[6]     Detective Seibert then signed an affidavit for a search warrant of Foster's home, which stated in part, "[O]fficers responded to [Foster's] residence due to an anonymous complaint that a strong chemical odor was coming from the residence." Defendant's Exhibit A. Despite attesting that he "speaks from personal knowledge and observation," *id.*, Detective Seibert did not have personal knowledge that police officers had responded due to an anonymous complaint. The trial court authorized the search. During the search, police officers observed an active "one pot" manufacturing lab, the contents of which were still undergoing a chemical reaction. Tr. at 207. In addition, they observed the following items typically used in the manufacture, use, and dealing of methamphetamine: coffee filters, lye, a coffee bean grinder, digital scales, corner cut baggies, a used cold pack, a straw used to inhale or smoke narcotics, and camping fuel. No pseudoephedrine pills were discovered during

the search of the home.  On April 25, 2015, the State charged Foster with dealing in methamphetamine as a Level 2 felony ("Count I"), conspiracy to commit dealing in methamphetamine as a Level 2 felony ("Count II"), and attempted dealing in methamphetamine as a Level 3 felony ("Count III").

[7]     In September 2015, Foster filed a motion for a *Franks* hearing and/or a motion to suppress, alleging Detective Seibert recklessly included a false statement in his application for the search warrant, the false statement was necessary to the finding of probable cause, and therefore all evidence seized during the search was fruit of the poisonous tree.  At a hearing on the matter, Detective Seibert admitted he did not have personal knowledge that police officers had received an anonymous tip regarding an odor coming from the house, claiming the statement was innocently included due to a "a typo from a cut and paste from when the warrant was typed."  *Id.* at 84.  He further claimed he only signed the affidavit, explaining an individual in the prosecutor's office typed the affidavit pursuant to Detective Hensley's account of the facts.  The trial court ultimately struck the false statement from the affidavit and concluded the remaining information established probable cause for the issuance of the warrant and therefore the evidence seized pursuant to the warrant was lawful.

[8]     At trial, the State admitted evidence seized during the search of Foster's residence.  Foster objected, alleging the admission of evidence violated the Fourth Amendment.  The trial court overruled his objection, and the jury returned guilty verdicts on all three counts.  At sentencing, the trial court entered judgment of conviction only on Count II, conspiracy to commit dealing

in methamphetamine, due to double jeopardy concerns and sentenced Foster to twenty-two and one-half years in the Department of Correction. This appeal ensued.

# Discussion and Decision

## I. Admission of Evidence

### A. Standard of Review

At the outset, we note Foster did not seek interlocutory review of the trial court's denial of his pretrial motion to suppress/*Franks* motion and we therefore consider his appeal as a request for this court to review the trial court's decision to admit evidence at trial. *See Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). We review a trial court's admission of evidence for an abuse of discretion. *McVey v. State*, 863 N.E.2d 434, 440 (Ind. Ct. App. 2007), *trans. denied*. "An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court." *Id*. We neither weigh the evidence nor resolve questions of credibility, "but consider the evidence which supports the decision of the trier of fact in the case of contested evidence and any uncontested evidence presented by the appellant." *Davies v. State*, 730 N.E.2d 726, 732 (Ind. Ct. App. 2000), *trans. denied*, *cert. denied*, 532 U.S. 945 (2001).

# B. Search Warrant

[10] Foster argues the affidavit supporting the issuance of the search warrant contained a false statement that misled the issuing court and therefore the search was unconstitutional under the Fourth Amendment. The Fourth Amendment requires a hearing be held in the event a defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [was] necessary to the finding of probable cause . . . ." *Franks v. Delaware*, 438 U.S. 154,155-56 (1978). Stated differently, only when the defendant satisfies this burden and the remaining information in the affidavit is insufficient to establish probable cause is the search warrant deemed void. *Id*. at 156.

[11]    In deciding whether to issue a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." The duty of the reviewing court is to determine whether the magistrate had a "substantial basis" for concluding that probable cause existed. It is clear that a substantial basis requires the reviewing court, with significant deference to the magistrate's determination, to focus on whether reasonable inferences drawn from the totality of the evidence support the determination of probable cause. A "reviewing court" for these purposes includes both the trial court ruling on a motion to suppress and an appellate court reviewing that decision. In this review, we consider only the evidence presented to the issuing magistrate and not post hoc justifications for the search.

*Query v. State*, 745 N.E.2d 769, 771 (Ind. 2001) (alterations in original) (citations omitted). Here, in signing the affidavit, Detective Seibert swore that police officers responded to Foster's residence due to an anonymous complaint that a strong chemical odor was coming from the residence. This fact is supported by the record. However, Detective Seibert had no knowledge of this fact before signing the affidavit. Upon Foster's motion, the trial court struck that portion of the affidavit and concluded the remaining information was sufficient to support a probable cause determination. On appeal, Foster acknowledges the remaining information included in the affidavit is sufficient to determine probable cause exists,[2] *see* Brief of Appellant at 27-28, but cites *Esquerdo v. State*, 640 N.E.2d 1023 (Ind. 1994), and argues even if there was sufficient probable cause, the affidavit's false statement tainted the probable cause determination thereby invalidating the search warrant.

[12] In *Esquerdo*, a confidential informant advised police officers Esquerdo was selling drugs from his home. Following a controlled buy, the confidential informant notified police officers that she believed Esquerdo was destroying

---

[2] We agree. The remaining information in the affidavit provides the following narrative: police officers observed a strong chemical odor typically associated with the manufacturing of methamphetamine emanating from the home; police officers attempted to contact Thurston and Foster inside the residence, but neither answered the door; soon thereafter, Thurston and Foster exited the home in a fashion that indicated the pair were attempting to elude police officers; and the police officers ultimately made contact with Foster and observed a strong chemical odor associated with the manufacturing of methamphetamine. Such a narrative is sufficient to support a probable cause determination. *See, e.g.*, *State v. Hawkins*, 766 N.E.2d 749, 752 (Ind. Ct. App. 2002) ("[W]hen a trained and experienced police officer detects the strong and distinctive odor of burnt marijuana coming from a vehicle, the officer has probable cause to search the vehicle."), *trans. denied*.

evidence. Without a warrant, police officers forcibly entered Esquerdo's residence and observed cocaine and marijuana in plain view. Thereafter, the police officers submitted an affidavit for a search warrant, which included information regarding the controlled buy and the narcotics found in plain view. Upon the issuance of the search warrant, police officers conducted a more detailed search of Esquerdo's residence, finding more evidence of drug use. Prior to trial, Esquerdo moved to suppress the evidence found during the warrantless entry, as well as the evidence seized pursuant to the search warrant, which the trial court denied. This court affirmed.

[13] On transfer, our supreme court considered Esquerdo's argument the evidence seized during the warrantless entry was fruit of the poisonous tree for lack of exigent circumstances, and therefore the evidence seized pursuant to the search warrant was also fruit of the poisonous tree because the information contained in the affidavit for the search warrant was the product of the warrantless entry. The court agreed no exigent circumstances existed to justify the warrantless entry into Esquerdo's home, *id.* at 1028, and then considered whether illegally obtained evidence that is presented as evidence of probable cause can taint an otherwise sufficient probable cause determination thereby invalidating a search warrant.

[14] In its analysis, the court acknowledged the affidavit included evidence of the controlled buy, which on its own, made it reasonable for the issuing court to conclude sufficient probable cause existed to issue a search warrant. *Id.* at 1029. However, the court concluded the evidence illegally seized during the

warrantless search and used to obtain a search warrant tainted the probable cause determination and rendered the search invalid because allowing the police to attain a search warrant in such a way would "would give the police incentive to enter [] a residence, without a judicially-issued warrant, and search for evidence to bolster any evidence supporting probable cause that the police already possess." *Id*. at 1030.

[15] Foster argues the present case is analogous to *Esquerdo*, contending Detective Seibert's false statement tainted an otherwise proper probable cause determination. However, unlike *Esquerdo*, the affidavit here included no illegally obtained evidence but merely a false statement regarding whether Detective Seibert had personal knowledge of the anonymous complaint, a fact we do not consider relevant considering the probable cause affidavit included sufficient information regarding numerous police officers who observed a strong chemical odor emanating from Foster's residence. *See supra* note 2. We therefore find the limited holding in *Esquerdo* inapplicable to the present case and conclude the trial court did not err in admitting evidence found pursuant to the search warrant.

## II. Conspiracy to Commit Dealing in Methamphetamine

### A. Standard of Review

[16] Foster contends the evidence is insufficient to support his conviction for conspiracy to commit dealing in methamphetamine as a Level 2 felony. When reviewing the sufficiency of the evidence to support a conviction, we consider

only the probative evidence and reasonable inferences supporting the judgment. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We neither reweigh the evidence nor reassess the credibility of witnesses. *Id.* We will affirm a conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id.* at 146-47 (citation omitted).

## B. Sufficiency of the Evidence

[17] Foster argues the State presented insufficient evidence to support his conviction, arguing the evidence does not establish his unfinished methamphetamine mixture would have yielded between five and ten grams of methamphetamine. The State charged Foster with conspiracy to commit dealing in methamphetamine as a Level 2 felony. Indiana Code section 35-41-5-2 states,

> (a) A person conspires to commit a felony when, with intent to commit the felony, the person agrees with another person to commit the felony. . . .

> (b) The state must allege and prove that either the person or the person with whom he or she agreed performed an overt act in furtherance of the agreement.

Generally, a person who knowingly or intentionally manufactures, finances the manufacture, delivers, or finances the delivery of pure or adulterated methamphetamine commits dealing in methamphetamine as a Level 5 felony. Ind. Code § 35-48-4-1.1(a). However, the crime is enhanced to a Level 2 felony if the State proves "the amount of the drug involved is at least five (5) grams but less than ten (10) grams and an enhancing circumstance applies." Ind. Code §

35-48-4-1.1(e). As an enhancing circumstance, the State alleged Foster manufactured or financed the manufacture of methamphetamine pursuant to Indiana Code section 35-48-1-16.5 (defining an "enhancing circumstance"). Therefore, in order to sustain a conviction for conspiracy to commit dealing as a Level 2 felony, the State was required to prove Foster (1) intended to commit dealing in methamphetamine, (2) agreed with Thurston to commit the felony, (3) either Thurston or Foster performed an overt act in furtherance of the agreement, (4) the amount of drug involved was between five and ten grams, and (5) Foster manufactured or financed the manufacture of the drug. Foster only argues the evidence is insufficient to support the fourth element.

[18] At the outset, it is necessary to note when police officers searched Foster's residence the manufacturing process was not yet complete, leaving only an intermediate mixture of methamphetamine. *See Buelna v. State*, 20 N.E.3d 137, 141-42 (Ind. 2014) (describing the final extracted methamphetamine as "adulterated" methamphetamine and methamphetamine that has not undergone the entire manufacturing process as an "intermediate mixture"). "An intermediate chemical mixture is not a controlled substance or drug under the Indiana criminal code" and is considered "neither 'adulterated' nor 'pure' methamphetamine." *Id*. at 146. Therefore, in instances where, as here, the State relies on an intermediate mixture to satisfy an enhancement, it may not simply rely on the weight of the intermediate mixture; rather "it must demonstrate how much final product a defendant's particular manufacturing process would have yielded had it not been interrupted by police . . . ." *Id*.

[19] There are several ways the State can demonstrate the weight of a final yield. *Id.* Sufficient evidence of final yield may come from a skilled or expert witness. *Id.* For example, the State may introduce evidence of the amount of finished product as weighed by a forensic scientist, elicit direct testimony of the actual weight of the final yield from those who "regularly use or deal in the substance" or "developed an acute ability to assess the weight" of the drugs in which they deal, or may offer testimony from police officers or detectives who regularly investigate methamphetamine crimes to establish the weight of the final product. *Id.* at 147-48.

> Skilled witness testimony is permissible as long as the method the witness uses for showing final yield is accurately tailored to the specific manufacturing conditions, ingredients, and skill of the accused. And the testimony cannot leave reasonable doubt that the defendant's final yield would fail to surpass the [weight] . . . threshold.

*Id.* at 146.

[20] Here, the State relied largely on the testimony of Detective Hensley to indicate Foster's final yield would have been between five and ten grams.[3] Detective Hensley has been employed by the Evansville Police Department for sixteen years and has served as a detective for the Evansville Police Department-Vanderburgh County Joint Task Force for the past four years, specifically

---

[3] At trial, Foster conceded Detective Hensley is a skilled witness pursuant to Indiana Evidence Rule 701. *See* Tr. at 156.

working in the Methamphetamine Suppression Unit. In total, he has investigated over 800 methamphetamine labs. He has also attended multiple classes that require police officers to engage in discussion and training about the manufacturing of methamphetamine. Detective Hensley learned the different methods of manufacturing, how to successfully dismantle a methamphetamine lab, and how to cook methamphetamine. In addition, the classes required Detective Hensley to undergo training in regard to the different yield ratios for the different manufacturing methods. He successfully completed his schooling, receiving certifications from the Drug Enforcement Agency as a Clandestine Lab Investigator and Site Safety Supervisor. Over his career, Detective Hensley has cooked methamphetamine approximately ten times in controlled settings, largely utilizing the one-pot method.

[21] Detective Hensley testified there are generally four methods to manufacture methamphetamine, including the one-pot method, which does not require much skill and provides the highest yield. In determining the yield ratio for the one-pot method, Detective Hensley opined,

> [T]he main consideration is the amount of pills that you are putting in. Because of the actual reduction process the amount of pills you're putting in will give you the weight of your pseudoephedrine based-cold medication, which in time will give you the yield ratio or the percentage of the finished product.

Tr. at 157. Another vital consideration is the barometric pressure in the atmosphere surrounding the lab. *Id.* at 159. A successful one-pot

manufacturing lab will yield no less than 50% and no more than 92%, with the most common yield being 80%. *Id.* at 158-60.

[22] Here, Detective Hensley provided the confidential informant with 100, 120 milligram pseudoephedrine pills, totaling twelve grams. All 100 hundred pills were then given to Foster in exchange for three grams of the methamphetamine Foster would soon attempt to cook. Foster immediately requested Thurston come to his house because he was "ready to go." *Id*. at 377. Thurston brought over camping fuel, and at Foster's additional request, retrieved sodium hydroxide (lye), coffee filters, and a one-gallon plastic container. Thurston was under the impression he would receive one gram of the methamphetamine Foster would soon attempt to cook. During the search of Foster's residence, Detective Hensley observed multiple precursors and a one-pot lab, the contents of which were still undergoing a chemical reaction. Specifically, he noted Foster utilized a one-gallon plastic container instead of the commonly used two-liter plastic container, which he claimed through his training was indicative of Foster's intent to manufacture more methamphetamine.

[23] Detective Hensley described the manufacturing conditions as "a pretty controlled environment, obviously it is inside a basement that is inside a residence, so you really [do not] have to worry about the weather or pressure or anything like that, so it is a pretty controlled environment." *Id.* at 182. Ultimately, Detective Hensley opined that, but-for police intervention, Foster's one-pot lab would have yielded between 50% and 92%. Given his testimony noted above, namely the facts that the confidential informant provided 100, 120

milligram pseudoephedrine pills totaling twelve grams, no pills were found in Foster's residence or on his person, and Foster's reaction vessel was larger than most, Detective Hensley concluded Foster's one-pot lab would have yielded between six and ten point eight (10.8) grams of methamphetamine.

[24] Foster argues there is no evidence he used 100 pills and therefore Detective Hensley's opinion in regards to Foster's final yield amounted to mere speculation and conjecture. We disagree.[4] Foster was in need of pseudoephedrine and the confidential informant provided him with 100, 120 milligrams pseudoephedrine pills. As soon as he received the pills, he called Thurston, stating he was "ready to go." *Id.* at 377. Foster used a one-gallon plastic container as his reaction vessel, which is larger than the two-liter plastic container Detective Hensley typically encounters. In addition, law enforcement did not find any pseudoephedrine pills in Foster's residence or on his person. The facts here give rise to an inference that Foster intended to use and did use at least 100, 120 milligram pills totaling twelve grams of pseudoephedrine. Given this inference, coupled with Foster's manufacturing process, the

---

[4] Stated differently, Foster would have us require, as a matter of law, there be direct evidence of the amount of pseudoephedrine pills placed into a reaction vessel in situations where the manufacturing process is interrupted in order to convict defendants under Indiana Code section 35-48-4-1.1(c)-(e) (felony enhancements). We believe such a requirement would render the enhancement useless because in situations where the manufacturing process is interrupted and there is no tangible final yield, it would be impossible to determine the amount of pseudoephedrine used without a defendant's confession or some other form of evidence explicitly indicating the defendant utilized a certain amount of pills, such as a co-conspirator witnessing exactly 100 ground up pills being placed in the vessel. In addition, if we were to require such specific evidence, it would give law enforcement an incentive to allow individuals to continue and finish the manufacturing process; given the dangers inherent in manufacturing methamphetamine, such a circumstance would undoubtedly increase risk of injury to those in the vicinity of a methamphetamine lab.

manufacturing conditions, evidence of the precursors, and the lack of skill necessary to manufacture methamphetamine via the one-pot method, Detective Hensley opined Foster would have produced at the very *least* six grams of methamphetamine. Based on the foregoing, a reasonable jury could conclude Foster's manufacturing lab would have yielded between five and ten grams of methamphetamine if it had not been interrupted by police. Therefore, the evidence is sufficient to support Foster's conviction for conspiracy to commit dealing in methamphetamine as a Level 2 felony.

# III. Double Jeopardy

Foster argues his conviction as a Level 2 felony implicates double jeopardy because "the enhancement charge[] [is] simply a restatement of the underlying charge[]."[5] Br. of Appellant at 39. Although somewhat difficult to comprehend, it appears he contends the fact he manufactured methamphetamine was not only used to prove he conspired to commit dealing in methamphetamine as an underlying offense but was also the fact utilized by the State to subject him to the higher sentencing range imposed for dealing in methamphetamine as a Level 2 felony. We disagree.

---

[5] The State argues Foster has waived this claim in not objecting at trial. We note a double jeopardy violation, if shown, can constitute fundamental error and must be reviewed on a case by case basis. *See Taylor v. State*, 717 N.E.2d 90, 95 n.7 (Ind. 1999) ("We decline to apply prior summary declarations that violations of double jeopardy rights constitute fundamental error. The issue of fundamental error is better determined on a case by case basis.").

The Fifth Amendment to the United States Constitution provides "[n]o person shall be . . . subject for the same offense to be twice put in jeopardy of life or limb . . . ." Under the Fifth Amendment, a defendant's conviction upon multiple offenses will not be precluded by double jeopardy principles if each statutory offense requires proof of a fact the other does not. *Blockburger v. United States*, 284 U.S. 299, 302 (1932).

Similarly, Article 1, Section 14 of the Indiana Constitution states "[n]o person shall be put in jeopardy twice for the same offense." Two offenses are the "same offense" in violation of Article 1, Section 14, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense. *Richardson v. State*, 717 N.E.2d 32, 49-50 (Ind. 1999). Both Constitutions prohibit multiple punishments for the same offense. *Davis v. State*, 770 N.E.2d 319, 323 (Ind. 2002). Therefore, the constitutional double jeopardy provisions govern claims regarding the elements of multiple crimes. *Nicoson v. State*, 938 N.E.2d 660, 663 (Ind. 2010).

At the outset, we note Foster was convicted of only one offense: conspiracy to commit dealing in methamphetamine as a Level 2 felony. Because the aforementioned tests all require the comparison of the elements of multiple convictions, neither the *Blockburger* test, the *Richardson* actual evidence test, nor the *Richardson* statutory elements test is violated. *See id*. However, "[i]n addition to the instances covered by *Richardson*, 'we have long adhered to a

series of rules of statutory construction and common law that are often described as double jeopardy, but are not governed by the constitutional test set forth in *Richardson*.'" *Guyton v. State*, 771 N.E.2d 1141, 1143 (Ind. 2002) (quoting *Pierce v. State*, 761 N.E.2d 826, 830 (Ind. 2002)). "These rules are sometimes referred to as Justice Sullivan's categories because he first enumerated them in his concurring opinion in *Richardson*." *Zieman v. State*, 990 N.E.2d 53, 61 (Ind. Ct. App. 2013).

[29] One such category prohibits "[c]onviction and punishment for an enhancement of a crime where the enhancement is imposed for the very same behavior or harm as another crime for which the defendant has been convicted and punished." *Richardson*, 717 N.E.2d at 56 (Sullivan, J., concurring). In discussing this category, Justice Sullivan explained, "In situations where a defendant has been convicted of one crime for engaging in the specified additional behavior or causing the specified additional harm, that behavior or harm cannot also be used as an enhancement of a separate crime; either the enhancement or the separate crime is vacated." *Id.* Foster cites this category, arguing the fact he manufactured methamphetamine, which contributed to the enhancement of his offense to a Level 2 felony, is the very same behavior supporting the underlying offense that he conspired to commit dealing in manufacturing as a Level 5 felony.

[30] We do not see how this category is applicable to the present case. As Justice Sullivan made clear in *Richardson*, this category is applicable in situations where the behavior supporting a conviction for one crime is the same behavior used to

enhance a conviction for a *separate* crime.  *See id.*  Foster was only convicted of conspiracy to commit dealing in methamphetamine as a Level 2 felony, which required the State to prove Foster (1) *intended* to commit dealing in methamphetamine, (2) agreed with Thurston to commit the felony, (3) either Thurston or Foster performed an overt act in furtherance of the agreement, (4) the amount of drug involved was between five and ten grams, and (5) Foster manufactured or financed the manufacture of the drug.  Ind. Code §§ 35-48-4-1.1(a)(1), (e)(2); Ind. Code § 35-41-5-2; Ind. Code § 35-48-1-16.5(5).  Therefore, there is no separate conviction or enhancement for us to address. [6]

---

[6] Foster relies heavily on the dealing statute in support of the notion his conviction as a Level 2 felony is improper.  Dealing in methamphetamine as a Level 5 felony requires proof the defendant knowingly or intentionally manufactured, financed the manufacture of, delivered, or financed the delivery of pure or adulterated methamphetamine.  Ind. Code § 35-48-4-1.1(a).  The crime is enhanced to a Level 2 felony if the State proves the amount of drug involved is between five and ten grams and an enhancing circumstance applies.  Ind. Code § 35-48-4-1.1(e)(2).  One such enhancing circumstance is the defendant's manufacture or financing of the manufacture of methamphetamine.  Ind. Code § 35-48-1-16.5(5).  Therefore, hypothetically speaking, in situations where a defendant is charged with dealing in methamphetamine as a Level 5 felony based on evidence he did knowingly or intentionally manufacture or finance the manufacturing of methamphetamine, a concern may arise if that conviction is enhanced to a Level 2 felony based on the same fact the defendant manufactured or financed the manufacture of methamphetamine.  However, this situation is not applicable here.  Foster was charged with conspiracy to commit dealing in methamphetamine.  Conspiracy to commit dealing in methamphetamine as a Level 5 felony does not require the State to prove the defendant knowingly or intentionally manufactured or financed the manufacture of methamphetamine.  Rather, it requires the State to only prove a defendant *intended* to commit dealing in methamphetamine, agreed with another to commit dealing in methamphetamine, and one party to the agreement took an overt step in furtherance of the agreement.  Certainly, the fact Foster actually manufactured methamphetamine could be used as evidence to show he conspired to deal in methamphetamine.  Other facts supporting his conviction, however, include his act of attaining pseudoephedrine pills, his promise to provide methamphetamine to the confidential informant and Thurston in exchange for precursors, Thurston's acts of purchasing and providing precursors, and Foster's possession of scales and corner cut baggies.

[31] We conclude his conviction of conspiracy to commit dealing in methamphetamine as a Level 2 felony does not violate any prohibition against double jeopardy.

## IV. Disproportionate Sentence

[32] Foster claims his sentence cannot stand because it violates the Proportionality Clause of the Indiana Constitution. Specifically, and similar to his double jeopardy argument, he argues the same conduct of manufacturing or financing the manufacture of five to ten grams of methamphetamine can be either a Level 3 felony, Ind. Code § 35-48-4-1.1(d)(1), or a Level 2 felony, Ind. Code §§ 35-48-4-1.1(e)(2) and 35-48-1-16.5(5). Because defendants committing identical offenses can be given different sentences depending upon which statute they are charged under, Foster claims the statute is unconstitutional. *Compare* Ind. Code § 35-50-2-4.5 (a Level 2 felony carries a sentence between ten and thirty years) *with* Ind. Code § 35-50-2-5(b) (a Level 3 felony carries a sentence between three and sixteen years).

[33] At the outset, we note Foster did not challenge the constitutionality of the penalty for the offense at the trial court level. Therefore, the issue is waived. *See Adams v. State,* 804 N.E.2d 1169, 1172 (Ind. Ct. App. 2004) (holding the failure to challenge the constitutionality of a criminal statute by a motion to dismiss prior to trial waives the issue on appeal). Waiver notwithstanding, our standard of review is well settled:

> Every statute stands before us clothed with the presumption of
> constitutionality until clearly overcome by a contrary showing.
> The party challenging the constitutionality of the statute bears the
> burden of proof, and we resolve all doubts against that party. If
> there are two reasonable interpretations of a statute, one of which
> is constitutional and the other not, we will choose that path
> which permits upholding the statute because we will not presume
> that the legislature violated the constitution unless such is
> required by the unambiguous language of the statute.

*Poling v. State*, 853 N.E.2d 1270, 1275 (Ind. Ct. App. 2006) (citation omitted).

[34] Pursuant to Article 1, Section 16, of the Indiana Constitution, "All penalties shall be proportioned to the nature of the offense." Generally, a sentence violates the Proportionality Clause only when it is so severe and entirely out of proportion to the gravity of the offense committed that it "shock[s] public sentiment and violate[s] the judgment of a reasonable people." *Pritscher v. State*, 675 N.E.2d 727, 731 (Ind. Ct. App. 1996) (citation omitted). However, our supreme court has also held a sentence violates the proportionality clause where identical offenses are given different sentences. *Poling*, 853 N.E.2d at 1276-77.

[35] Indiana Code section 35-48-4-1.1 provides,

> (a) A person who:
>      (1) knowingly or intentionally:
>          (A) manufactures;
>          (B) finances the manufacture of;
>          (C) delivers; or
>          (D) finances the delivery of;
>
> methamphetamine, pure or adulterated;

\* \* \*

commits dealing in methamphetamine, a Level 5 felony, except
as provided in subsections (b) through (e).

\* \* \*

(d) The offense is a Level 3 felony if:
    (1) the amount of the drug involved is at least five (5)
    grams but less than ten (10) grams; or
    (2) the amount of the drug involved is at least one (1) gram
    but less than five (5) grams and an enhancing circumstance
    applies.

(e) The offense is a Level 2 felony if:
    (1) the amount of the drug involved is at least ten (10)
    grams;
    (2) the amount of the drug involved is at least five (5)
    grams but less than ten (10) grams and an enhancing
    circumstance applies; or
    (3) the person is manufacturing the drug and the
    manufacture results in an explosion causing serious bodily
    injury to a person other than the manufacturer.

Given the facts in this case, the plain and unambiguous language of the statute

required the State, in order to convict Foster of a Level 3 felony, to prove the

amount of methamphetamine involved was between five and ten grams.

However, in order to convict Foster of a Level 2 felony, the State was required

to prove the amount of methamphetamine involved was between five and ten

grams, *and* as an enhancing circumstance, that Foster manufactured or financed

the manufacture of the drug he and Thurston conspired to deal. *See* Ind. Code §

35-48-1-16.5(5). Therefore, convicting Foster of conspiracy to commit dealing in methamphetamine as a Level 2 felony requires proof of an additional element not required to sustain a conviction for the same as a Level 3 felony and therefore the two crimes are not identical. *See Poling*, 853 N.E.2d at 1276-77; *supra*, Part III. We conclude Indiana Code section 35-48-4-1.1 does not violate Indiana's Proportionality Clause as applied to Foster.

## V. Inappropriate Sentence

[36] Foster further contends his sentence is inappropriate in light of the nature of the offense and his character. Indiana Appellate Rule 7(B) provides, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The defendant bears the burden of persuading this court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether we regard a sentence as inappropriate turns on "the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). Finally, we note the principal role of appellate review is to "leaven the outliers," not achieve the perceived "correct" result in each case. *Id*. at 1225. We therefore "focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Id*.

[37] The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Childress*, 848 N.E.2d at 1081. The trial court entered judgment of conviction for conspiracy to commit dealing in methamphetamine as a Level 2 felony. A person convicted of a Level 2 felony shall be imprisoned for a fixed term between ten and thirty years, with the advisory sentence being seventeen and one-half years. Ind. Code § 35–50–2–4.5. The trial court sentenced Foster to twenty-two and one-half years in the Department of Correction. As to the nature of the offense, we note nothing egregious or exceptional.

[38] As to Foster's character, we note he is twenty-four years old and has been convicted of multiple prior felonies. Specifically, Foster was previously convicted of dealing in methamphetamine and was sentenced only to probation. Foster violated probation in committing the present offense, which indicates a reckless disregard for the law and an inability to take advantage of a previously lenient sentence. We conclude Foster's sentence is not inappropriate in light of the nature of the offense and his character.

# Conclusion

[39] Foster makes a litany of arguments challenging his conviction and sentence, all of which we reject. We conclude the trial court did not err in admitting evidence seized during the search of Foster's residence. In addition, the evidence is sufficient to sustain his conviction for conspiracy to commit dealing in methamphetamine as a Level 2 felony. This conviction does not violate any

prohibition against double jeopardy.  Moreover, Foster's sentence does not violate the Proportionality Clause nor is it inappropriate.  Accordingly, we affirm Foster's conviction and sentence.

[40]   Affirmed.

Najam, J., and Crone, J., concur.