## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Oct 12 2016, 8:29 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Yvettte M. LaPlante
Keating & LaPlante, LLP
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Charles Anthony Hardy, Jr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

October 12, 2016

Court of Appeals Case No.
82A05-1512-CR-2242

Appeal from the
Vanderburgh Circuit Court

The Honorable
Michael J. Cox, Magistrate

Trial Court Cause No.
82C01-1404-FB-512

**Kirsch, Judge.**

[1] Following a jury trial, Charles Anthony Hardy, Jr. ("Hardy"), appeals his convictions for Class B felony dealing in methamphetamine[1] and Class C felony operating a motor vehicle after forfeiture of driving privileges for life[2] and raises the following restated issued: whether the State presented sufficient evidence to support his convictions.

[2] We affirm.

## Facts and Procedural History

[3] On April 23, 2014, Evansville Police Department Detective Michael Gray ("Detective Gray") of the Narcotics Joint Task Force ("NJTF") met with a confidential informant ("the C.I."), who informed Detective Gray that he could buy methamphetamine from Hardy. The NJTF decided to proceed to "set up a deal," and, in Detective Gray's presence, the C.I. called Hardy at and arranged to meet him that afternoon. *Tr.* at 74, 214. Detective Gray searched the C.I., and no drugs were found on him. Detective Gray equipped the C.I. with an audio recording device and a transmitter and gave him cash that previously had been photocopied.[3] The sale was arranged to occur at a certain Marathon gas

---

[1] *See* Ind. Code § 35-48-4-1.1(a)(1). We note that the statutes under which Hardy was convicted were amended, effective July 1, 2014, but we will apply the versions of those statutes that were in effect at the time Hardy committed his offenses, in April 2014.

[2] *See* Ind. Code § 9-30-10-17.

[3] The record is conflicting as to whether the C.I. was given $200 and spent all of it, or whether he was given $300 and spent $200 of that, returning the excess $100 to the detective. *Tr.* at 77, 140.

station, and Detective Gray dropped off the C.I. at a location within walking distance of the gas station.

[4]     Vanderburgh County Sheriff's Department Sergeant Jason Ashworth ("Sergeant Ashworth") and Detective Gray, along with other NJTF officers, provided surveillance of the transaction. Sergeant Ashworth observed the C.I. get into a maroon Dodge Durango that was being driven by Hardy. Hardy and the C.I. were the only individuals in the Durango. NJTF officers heard Hardy tell the C.I. that he was going to drive to an apartment to find out who had stolen his girlfriend's drugs that he had given to her. *Id*. at 23 (referring in the vehicle to his girlfriend's "sh\*t") and 95 (referring in the apartment to his girlfriend's "dope"); *State's Ex*. 5. Realizing that the controlled buy was "going mobile," such that Hardy and the C.I. were moving to another location, the NJTF officers adjusted their perimeter set-up and followed Hardy's vehicle to an apartment at Michigan and Read Streets. *Tr*. at 78.

[5]     Sergeant Ashworth observed Hardy and the C.I. enter the apartment, and, from a separate location, Detective Gray, also saw the two men enter the residence. After approximately fifteen minutes, the C.I. and Hardy left the Michigan and Read Street apartment and got into the Durango, along with a third unnamed person. Hardy drove back to the gas station, and the C.I. exited the Durango. The C.I. walked to the initial drop-off location, where Detective Gray picked up the C.I. and took him to a location where the officers "debriefed" the C.I., to talk about what happened during the sale. *Id*. at 81. The C.I. turned over to

Detective Gray a substance later confirmed to be 1.8 grams of methamphetamine for which the C.I. had paid $200.

[6] The following day, on April 24, 2014, Detective Gray, who knew that Hardy's driver's license had been suspended for life, observed Hardy driving the Dodge Durango. Detective Gray radioed uniformed officers in the area and told them that Hardy's driving privileges had been suspended for life and there was a warrant out for his arrest. Evansville Police Detective Jeff Kingery ("Detective Kingery") ran a search of Hardy's name, which provided Detective Kingery with a photograph of Hardy and confirmed that Hardy was "HTV for life." *Tr.* at 155-56. Thereafter, Detective Kingery and his NJTF partner Vanderburgh County Sheriff's Department Detective Michael Bishop ("Detective Bishop") performed a traffic stop of the Dodge Durango that Hardy was driving.

[7] Detective Kingery removed Hardy from the vehicle and placed him under arrest. Detective Bishop made contact with the passenger, who happened to be the C.I., and had him exit the vehicle. The C.I. was searched but did not have any contraband on him. When Detective Kingery patted down Hardy, he found that Hardy had "a large amount of currency" on him, which was later determined to be $2,500, and four of the fifty-dollar bills were later determined to be the photocopied buy money that Detective Gray had given to the C.I. the day before. *Id.* at 122.

[8] Meanwhile, Detective Bishop performed a search of the Durango. He found plastic bags inside the console between the seats, and, under the driver's seat, he

found a camouflaged zipper pouch containing a green leafy substance in a plastic bag, two other plastic bags containing a white crystal-like substance, and a digital scale. *Id.* at 168-69; *State's Exs.* 11-14, 22-26, 32. He also discovered another clear plastic bag containing a green leafy substance under the console. Later analysis revealed that the two plastic bags of green leafy substance contained over thirty grams of marijuana. *Tr.* at 209; *State's Ex.* 32. One of the plastic bags that contained a white crystal-like substance was later determined to be dimethylsulfone, a common cutting agent for methamphetamine. The other plastic bag that contained a white crystal-like substance later tested positive as being .39 grams of a combination of three substances: methamphetamine, dimethylsulfone, and marijuana.[4] *Tr.* at 205-12, 221; *State's Exs.* 30, 31. A cell phone was also found in the Durango. From a law enforcement cell phone, Detective Gray dialed the phone number that the C.I. had used the day before to call Hardy to set up the controlled buy, and the cell phone found in the Durango rang. The "back drop" or screensaver photograph on the cell phone was a picture of Hardy. *Tr.* at 120, 147.

[9] On April 28, 2014, the State charged Hardy with the following three counts, all related to the traffic stop occurring on April 24: (1) Count 1, Class B felony delivery of methamphetamine; (2) Count 2, Class C felony operating a motor vehicle after forfeiture of license for life; and (3) Count 3, Class D felony

---

[4] When asked on cross-examination how a white crystal-like substance could also test positive for marijuana, Detective Gray offered that perhaps it was residue of marijuana from re-use of the bag. *Tr.* at 235.

delivery of marijuana. *Appellant's App*. at 17-18. Approximately one year later, the State amended the information to add Count 4, Class B felony delivery of methamphetamine related to the C.I. transaction on April 23. *Id*. at 32. A two-day jury trial was held in October 2015.

[10]     At the jury trial, Detective Gray, who has participated in hundreds of undercover buy operations, explained the protocols of controlled drug buys, and he explained that the term "dope" refers to methamphetamine, heroin, or cocaine, but does not refer to marijuana. *Tr*. at 220. When asked to explain the substance dimethylsulfone, which was found in the Durango on April 24, Detective Gray explained that it is commonly referred to as "MSM" and is "specifically used for cutting methamphetamine" in order to increase quantity and maximize profits. *Id*. at 238, 239.

[11]     During Detective Gray's testimony, the State introduced as an exhibit the audio recording of the C.I.'s April 23, 2014 encounter with Hardy. Detective Gray identified Hardy's voice on the audio by explaining that he knew the C.I.'s voice, and there were only two people in the car, and "through the process of elimination," he knew the other voice belonged to Hardy. *Id*. at 91. Over Hardy's objection, the audio recording was played for the jury, and it began with the conversation between Hardy and the C.I. in the Durango. After the C.I. got into the vehicle, Hardy told the C.I. that he needed to go to an apartment to find out who stole his girlfriend's "sh*t" that Hardy had given to her for her "to get high on," "not all these punk a*s mother f*ckers" who took

her "sh*t." *Id*. at 89-90. Detective Gray observed Hardy and the C.I. go into the apartment.

[12] The audio recording taken in the apartment contained the voices of at least three adult males, including Hardy and the C.I., two females, and a child. Detective Gray described that what he heard on the audio was "chaotic," as there were various people talking, a television playing, and a child or children present. *Id*. at 132. There was conversation about drugs, including a male voice stating, "I want my girlfriend's dope." *Id*. at 95.

[13] The State's evidence also included text messages extracted from the cell phone found in the Durango, the lab analysis of the substances found on the C.I. and in the Durango, and money found on Hardy. The C.I. did not testify at trial. After the conclusion of the State's witness testimony, it introduced Hardy's certified driving record obtained from the Indiana Bureau of Motor Vehicles ("BMV"), which the trial court admitted without objection. *State's Ex*. 34.

[14] Hardy was found guilty of: (1) Count 1, Class D felony possession of methamphetamine, a lesser included charge of Class B felony dealing in methamphetamine; (2) Count 2, Class C felony operating a motor vehicle after forfeiting driving privileges for life; and (3) Count 4, Class B felony dealing in methamphetamine. *Appellant's App*. at 113-14, 116. Hardy was found not guilty of Count 3, Class D felony dealing in hash oil, hashish, or marijuana. *Id*. at 115. At the subsequent sentencing hearing, the trial court sentenced Hardy to an executed term of two years for possession of methamphetamine, an

executed term of four years for operating a motor vehicle after forfeiting driving privileges for life, and an executed term of fifteen years for delivery of methamphetamine; the trial court ordered the sentences to be served concurrently. Hardy now appeals.

## Discussion and Decision

[15] Hardy asserts that two of his convictions are not supported by sufficient evidence, namely the Class B felony dealing in methamphetamine conviction, stemming from the controlled buy on April 23, and the Class C felony operating a motor vehicle after forfeiting driving privileges for life conviction. When we review the sufficiency of the evidence to support a criminal conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Buelna v. State*, 20 N.E.3d 137, 141 (Ind. 2014). We neither reweigh the evidence nor assess witness credibility. *Robertson v. State,* 877 N.E.2d 507, 515 (Ind. Ct. App. 2007). It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Hale v. State*, 875 N.E.2d 438, 445 (Ind. Ct. App. 2007), *trans. denied*. Rather, we will affirm the conviction if there exists evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Robertson*, 877 N.E.2d at 515. Reversal is appropriate only when reasonable persons would not be able to form inferences as to each material element of the offense. *Heyen v. State*, 936 N.E.2d 294, 302 (Ind. Ct. App. 2010), *trans. denied*.

# I. Dealing in Methamphetamine

Hardy claims the jury's verdict of guilty of dealing in methamphetamine was "merely speculative." *Appellant's Br*. at 8. He argues that "there were too many uncontrolled factors," and the evidence was insufficient to convict him. *Id*. at 9.

To convict Hardy of dealing in methamphetamine, the State was required to prove that Hardy knowingly or intentionally delivered methamphetamine to the C.I. Ind. Code § 35-48-4-1.1(a)(1). Here, Hardy argues that the State failed to establish that it was Hardy who transferred methamphetamine to the C.I. and that the jury's finding to the contrary was based on speculation. In support of his position, he observes that the controlled buy was moved from its original location at the gas station to an apartment, inside of which there were various unidentified persons, the scene was "chaotic" with a television playing and various people speaking, and one of the unidentified individuals left the apartment with Hardy and the C.I. Hardy also argues that the C.I. had "no track record with the police" and was not known to be credible. *Appellant's Br*. at 11. Hardy maintains that "the detectives lost control of the controlled buy so much that the jury's verdict regarding Hardy's dealing in methamphetamine is based entirely on speculation." *Id*. at 10. At its core, Hardy's argument is that there was insufficient evidence from which the jury could infer that he was the person that sold methamphetamine to the C.I. on April 23. We disagree.

[18]    On April 23, the C.I. informed law enforcement that he could purchase methamphetamine from Hardy, and a controlled buy was arranged. The C.I., using a law enforcement phone, called Hardy's phone number, which the C.I. knew, and arranged to meet Hardy at a Marathon gas station. The C.I. was searched beforehand, and there were no drugs on him, and he was provided with previously-photocopied buy money. The C.I. met Hardy at the agreed Marathon station. The C.I. got into Hardy's vehicle, and the two of them drove to an apartment because Hardy wanted to determine who stole the drugs that Hardy had given to his girlfriend. NJTF officers observed the C.I. and Hardy enter the apartment. The audio from inside the apartment was, at times, unclear, although conversation about drugs and "dope" can be heard. *Tr.* at 95, 99, 100, 102, 104, 105, 109. When the C.I. and Hardy exited the apartment, they got into Hardy's Durango, Hardy dropped off the C.I. back at the Marathon station, and the C.I. then met up with Detective Gray. After being debriefed, the C.I. turned over to Detective Gray 1.8 grams of methamphetamine. When Hardy's vehicle was stopped by police the next day, Hardy had on his person $200 of the previously-photocopied buy money, specifically four of the fifty-dollar bills. Hardy also had nearby to him in the Durango, among other things, empty baggies, a digital scale, over thirty grams of marijuana, and the MSM cutting agent, all of which Detective Gray testified were indicators of dealing, as opposed to only using, methamphetamine. Detective Gray also observed that Hardy had $2,500 in cash on his person, mostly in $20s, $10s, and $5s, which also suggested to Detective Gray, in

combination with the other items in Hardy's vehicle, that Hardy was dealing drugs.

[19] Hardy urges us to find that his situation was similar to that of the defendant in *Watson v. State*, 839 N.E.2d 1291 (Ind. Ct. App. 2005), where this court overturned Watson's conviction for dealing in cocaine. 839 N.E.2d at 1294. There, a confidential informant advised a detective that she could purchase cocaine from Watson at a certain White Castle restaurant. Thereafter, the confidential informant met with United Drug Task Force ("UDTF") officers to prepare for the drug buy. *Id.* at 1292. Officers photocopied cash and gave the buy money to the confidential informant, and they equipped her with an audio transmitter. *Id.* The UTDF officers did not search the confidential informant before the buy. *Id.*

[20] The confidential informant and Watson met at the White Castle, the confidential informant got in Watson's vehicle for less than a minute, and then exited it. Thereafter, UDTF officers took both the confidential informant and Watson into custody. The buy money was found on Watson, and 3.25 grams of cocaine was found in the confidential informant's front pocket. *Id.* Watson was charged with dealing in cocaine and possession of cocaine. At trial, the confidential informant did not testify. A jury found Watson guilty, and the trial court entered conviction and sentence on the dealing charge. *Id.* at 1293.

[21] On appeal, Watson argued that the evidence was insufficient to convict him. "Specifically, he asserts the buy was not 'controlled' because the [confidential

informant] was not searched prior to the buy." *Id.* A panel of this court agreed with Watson, stating, "*Because the [confidential informant] was not searched prior to the buy* and the [confidential informant] did not testify about receiving the cocaine from Watson, we must agree with Watson that no reasonable fact-finder, based on this evidence alone, could have found beyond a reasonable doubt he originally possessed the cocaine found on the [confidential informant] after the buy." *Id.* (emphasis added). The *Watson* court reasoned, "Presumably, the pre-buy search establishes the person making the purchase for the police does not have contraband prior to the transaction with the target." *Id.* at 1294. The State in *Watson* argued that other circumstantial evidence showed that Watson was the source of the cocaine; however, the *Watson* court rejected that argument and held, "We are unwilling to hold that *where the [confidential informant] is not searched prior to the controlled buy* and the [confidential informant] does not testify at trial, a defendant's possession of the buy money is sufficient to sustain a conviction." *Id.* (emphasis added). It concluded, "We find the lack of a pre-buy search is fatal to the State's charge of dealing in cocaine." *Id.*

[22] We find that *Watson*, while relevant and factually similar, is distinguishable from the present case, where the C.I. was searched before and after the controlled drug buy. *Tr.* at 73-74, 81. The *Watson* court noted the importance of the pre-buy search to its decision, "We emphasize that had the [confidential informant] testified *or had she been properly searched before the buy*, the jury would

have had a reasonable basis for believing Watson had the cocaine before the buy." *Watson*, 839 N.E.2d at 1294 (emphasis added).

[23]   This court has recognized that in a controlled buy situation, "The adequacy of control goes to the weight and credibility of the evidence presented, which we will not reweigh." *Heyen*, 936 N.E.2d at 302 (citing *Hudson v. State*, 462 N.E.2d 1077, 1083 (Ind. Ct. App. 1984)). Whether the jury here could have made different inferences and reached a different conclusion from the evidence is not the pertinent inquiry. Rather, we are to determine whether, considering only the evidence and inferences supporting the verdict, there exists evidence of probative value from which a reasonable trier of fact could have found Hardy guilty beyond a reasonable doubt. *Robertson,* 877 N.E.2d at 515. Based on the record before us, we find that the inference made here by the jury – that Hardy was the one who delivered the methamphetamine to the C.I. – was reasonable. Hardy's argument is a request for us to reweigh the evidence, which we cannot do. *Id*. The State presented sufficient evidence to support Hardy's conviction for Count 4, dealing in methamphetamine.

## II.  Operating a Motor Vehicle After Forfeiture of Privileges

[24]   Hardy asserts on appeal that the evidence was not sufficient to convict him of Class C felony driving a motor vehicle after forfeiting his driving privileges for life because the State failed to tie the BMV driving record to Hardy. To convict Hardy, the State was required to prove that Hardy (1) operated a motor vehicle, and (2) that his driving privileges had been suspended for life. Ind. Code § 9-30-

10-17. On appeal, Hardy argues that, although a certified BMV driving record "of a man named Charles Hardy" was admitted into evidence, the State failed to produce any identifying information to properly tie him to the driving record that was admitted into evidence, and, thus, the evidence was insufficient to convict him. *Appellant's Br*. at 12.

[25] Initially, the State asserts that Hardy has waived this claim because, at trial, he acknowledged that he was the same "Charles Hardy" as the person whose name appeared on the driving record. Before resting its case at trial, the State advised the trial court that the State had finished its presentation of evidence through witnesses, but that "[w]e do have one more exhibit." *Tr*. at 241. The exchange was as follows:

> Prosecutor: What I have is the certified driving record from the Bureau of Motor Vehicles. It's certified, it's self-authenticating, I would offer that as State's Exhibit #34.

> Defense Attorney: No objection, Judge.

> Court: What is it again please?

> Prosecutor: It is the certified driving record, and it's State's Exhibit #34.

> Court: *Is that for Mr. Hardy*?

> Prosecutor: *It is*.

> Court:  Alright, without objection, State's Exhibit #34 is
> admitted into evidence[.]

*Id.* (emphasis added).  The State urges on appeal that, given that the trial court asked if the record was Hardy's, the State confirmed that it was Hardy's record, and Hardy did not object, Hardy cannot now claim that the State failed to tie the driving record to him.  The State also notes that in defense counsel's closing argument, he twice addressed the driving charge and indicated to the jury that it was not being challenged:

> I'm not even going to dispute, and waste your time, that Mr.
> Hardy was driving that day.  I think it's clear from the evidence
> that you've heard that [Hardy] was driving that vehicle, whether
> it was his vehicle or not . . . [H]e was driving the vehicle, he
> wasn't allowed to be, so I think Count [2] is pretty self-
> explanatory, I wouldn't ask you to waste much time on that.

*Id*. at 283.  Later, counsel again acknowledged that, as to "the driving charge," Hardy was "not arguing" that the State did not prove its case, in contrast to the drug-related offenses, which Hardy argued the State failed to prove.  *Id*. at 295. We find that, based on the record before us, Hardy did not preserve any claim regarding the BMV record; indeed, he did not oppose the State's assertion that the record was his and indicated to the jury that the driving charge (Count 2) was not at issue.  *See Flowers v. State*, 783 N.E.2d 1051, 1055 (Ind. 2000) (where defendant did not object "to the taking of blood, hair, and saliva samples," and at trial only objected to chain of custody, he waived appellate claim that evidence was inadmissible as product of search incident to illegal arrest).

[26] Regardless of waiver, the evidence was sufficient. Detective Gray testified that he saw Hardy driving on April 24, 2014. He was aware that Hardy's driving privileges had been forfeited for life, and he radioed other uniformed officers to request that they conduct a traffic stop. Detective Kingery testified that upon being contacted by "the undercover[]" officers, he ran Hardy's name and status in a search and confirmed he was "HTV for life," and he "pulled up" a photograph of Hardy. *Tr.* at 155-56. When Detective Kingery stopped Hardy in the Durango, he approached the vehicle, asked the driver his name, and, upon being "satisfied that [he] was the person who[se] license was HTV," Detective Kingery removed Hardy from the car and arrested him. *Id.* at 157. Hardy's BMV record was admitted into evidence without objection. We find that the evidence was sufficient to convict Hardy of Class C felony operating a motor vehicle after his driving privileges were forfeited for life.

[27] Affirmed.

[28] May, J., and Crone, J., concur.